United States Courts
Southern District of Texas
FILED
*January 07, 2021*
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | CRIMINAL NO. **4:21cr16** |
| v. | § § | |
| **E.I. DU PONT DE NEMOURS AND CO.** and **KENNETH J. SANDEL,** | § § § § § | 42 U.S.C. §§ 7413(c)(1) and 7412(r)(7) 18 U.S.C. § 2 42 U.S.C. § 7413(c)(4) |
| **Defendants.** | § | |

**INDICTMENT**

THE GRAND JURY CHARGES:

At all times material to this Indictment:

### INTRODUCTION

1.      Defendant **E.I. DU PONT DE NEMOURS AND CO.** ("DUPONT") owned a chemical plant in LaPorte, Texas. One unit of that plant, the Insecticide Business Unit ("IBU"), manufactured pesticides called Lannate and Vydate. These pesticides killed bugs on fruit, vegetables and crops. Lannate and Vydate generated annual net income for DUPONT of approximately $66 million and $57 million during 2014.

2.      Defendant **KENNETH J. SANDEL** ("SANDEL") ran the IBU from 2009 through November 15, 2014. SANDEL's title was Unit Operations Leader. SANDEL supervised eight employees including four shift supervisors and two engineers. Each shift supervisor, in turn, supervised approximately eight "operators" or workers. SANDEL was responsible for ensuring that the IBU's shift supervisors, operators and engineers understood and followed DUPONT's safety, health and environmental policies and procedures.

1

Methyl Mercaptan (MeSH)

3. The IBU used many toxic chemicals to produce Lannate and Vydate including MeSH also known as methyl mercaptan. MeSH was a colorless gas with a pungent odor at room temperature. MeSH occurred naturally in very small amounts in decaying wood, animal tissue and certain foods. MeSH was manufactured in large quantities for use as a raw material in the production of industrial products such as pesticides.

4. The Environmental Protection Agency (EPA) classified MeSH as an extremely hazardous substance under Title 42, United States Code, Section 11002(a)(2) because it was capable of producing serious health effects in humans in the event of a release. In fact, MeSH could kill people. Anyone who inhaled a sufficiently high concentration of MeSH would die quickly of asphyxiation. No treatment or antidote existed. MeSH killed by weakening breathing muscles, causing fluid to collect in the lungs, and disrupting the process through which the body's cells used oxygen and food to create energy.

5. MeSH was particularly dangerous because smell was not always a good indication of its presence. MeSH caused olfactory fatigue, meaning the inability to detect it by smell with increased exposure time.

6. The Occupational Safety and Health Administration made it illegal to expose workers to concentrations of MeSH gas greater than 10 parts per million. The American Industrial Hygiene Association determined that exposure to MeSH concentrations of 25 parts per million for more than an hour could cause irreversible or serious health effects, and that exposure to concentrations of 100 parts per million of MeSH for more than an hour could cause life-threatening health effects. The National Institute for Occupational Safety and Health determined it was "immediately dangerous to life and health" for anyone to breathe MeSH in a concentration greater than 150 parts per million.

7.   DUPONT and SANDEL knew about the dangers of MeSH. For example, DUPONT safety records said this about MeSH:

> "Human health effects of overexposure by inhalation, ingestion, or skin or eye contact may initially include: skin irritation … eye irritation … anemia; reduction of the blood's oxygen carrying capacity with cyanosis (bluish discoloration), weakness, or shortness of breath … nausea, headache, or weakness … abnormal liver function … or temporary elevation of blood pressure. Higher exposures may lead to … temporary nervous system depression with anaesthetic effects such as dizziness, headache, confusion, convulsions, incoordination, and loss of consciousness; or fatality from gross overexposure."

Similarly, DUPONT's written procedures for operating the IBU warned that a high concentration of MeSH could cause death by respiratory paralysis.

Clean Air Act

8.   In 1990, Congress enacted Section 112(r)(7) of the Clean Air Act, Title 42, United States Code, Section 7412(r)(7), in response to terrifying releases of chemicals in the United States and abroad that killed or injured many people. Section 7412(r)(7) directed the EPA to create reasonable regulations to prevent the release of certain chemicals and to minimize the consequences of any releases that occurred.

9.   Section 113(c)(1) of the Clean Air Act, Title 42, United States Code, Section 7413(c)(1), made it a crime for companies and certain individuals to knowingly violate any requirement of Section 7412(r) including requirements of regulations promulgated by the EPA under the authority of Section 7412(r). DUPONT and SANDEL were subject to this criminal statute.

Risk Management Program 3

10.   Under the authority of Section 7412(r)(7), the EPA imposed safety regulations called Risk Management Program regulations on owners and operators of manufacturing equipment in a "covered process" that contained more than a threshold quantity of a regulated

3

substance. MeSH was a regulated substance. The threshold quantity for MeSH was 10,000 pounds.

11. The Risk Management Program regulations had three levels of strictness depending on the degree of risk posed by the manufacturing process. The most risky manufacturing processes were subject to Risk Management Program 3. For example, pesticide manufacturing processes were subject to Program 3 if a release of the regulated substance could affect the public in a worst-case scenario. DUPONT, the owner of the IBU, and SANDEL, an operator of the IBU, were subject to Risk Management Program 3 regulations because the IBU manufactured pesticides, equipment in a covered process at the IBU stored up to 122,000 pounds of MeSH and a worst-case scenario release of MeSH from the IBU could affect the public.

Safe Work Practices Regulation – 40 C.F.R. § 68.69(d)

12. One Risk Management Program 3 regulation promulgated by the EPA under the authority of Section 7412(r)(7) required DUPONT and SANDEL, as owner and an operator of the IBU, to "develop and implement safe work practices to provide for the control of hazards during operations". This regulation was set out in Title 40, Code of Federal Regulations, Section 68.69(d). As an example of a hazardous activity, the regulation listed "opening process equipment or piping".

13. In response to this regulation, DUPONT developed mandatory company-wide minimum safety requirements for opening "hazardous processes and systems" to the atmosphere – an action commonly called a "line break". The requirements were set out in a document called "SHE Standard S27G Line Breaks". This document defined a hazardous process or system as "a process or system that contains any material at any pressure that could cause a risk of injury" including "especially gases in pipes" and "other lines that could contain material that is hazardous on contact or inhalation".

14. DUPONT also created a written Site Line Break Procedure specifically for the LaPorte plant. This procedure included the same requirements and definitions as Standard S27G. One of those requirements was that a qualified employee prepare a written job plan before opening any "hazardous process or system" to the atmosphere unless the line break was a routine operational job already covered by a written operating procedure. The preferred job plan was a properly completed line break permit. The job plan had to identify specific hazards of the line break, explain how to eliminate or control the hazards and describe what personal protective equipment ("PPE"), when to wear it, the duties of a standby person if appropriate, contingency plans, actions to take if conditions changed and how to control entry to the area affected by the line break. A supervisor and other DuPont personnel were supposed to review the job plan, decide whether it was safe to proceed and, if so, grant the permit.

15. The LaPorte line break procedure and Standard S27G also set out detailed requirements for actually carrying out line breaks. Among other steps, the procedure and standard required that workers "properly isolate" the section of the equipment or line to be opened. A line was "cleared" only when toxicity, corrosiveness and flammability hazards were "reduced to acceptable levels and verified with acceptable test methods". The line break procedure and standard also stated, "Where it cannot be demonstrated that a system is cleared, specific written procedures shall be in place to eliminate or control the hazards."

Management of Change Regulation – 40 C.F.R. § 68.75

16. Another Risk Management Program 3 regulation promulgated by the EPA under the authority of Section 7412(r)(7) required DUPONT and SANDEL, as owner and an operator of the IBU, to "establish and implement written procedures to manage changes … to process chemicals, technology, equipment, and procedures; and, changes to stationary sources that affect a covered process." This regulation was set out in Title 40, Code of Federal Regulations, Section

5

68.75. One goal of the required procedures – commonly called "management of change" procedures – was to ensure that owners and operators of chemical manufacturing equipment used a structured system to analyze how "any change" in the manufacturing process might introduce health and safety hazards before making the change.

17. In response to this regulation, DUPONT developed corporate standards that directed DUPONT's facilities, including the LaPorte plant, to establish written procedures to manage temporary, emergency and permanent changes to manufacturing processes and equipment. As an example of such a change, the corporate standards listed "New or modified equipment installations or configurations".

18. DUPONT also created written procedures to manage changes specifically at the LaPorte plant. These procedures included an Experimental Operating Instructions ("EOI") procedure and a Change of Design ("COD") procedure. The EOI procedure applied to "temporary preplanned operation of our manufacturing processes outside of procedures and limits", that is, "anytime you purposefully change the way you operate a process." The COD procedure applied to the installation of new equipment to a manufacturing process, physical changes to existing equipment and changes in the way control equipment operated.

19. Both procedures (EOI and COD) required a written authorization form that included a safety checklist; an explanation of all safety concerns, what was being done about those concerns and whether it was safe to make the change or necessary to conduct a more formal analysis of the hazards; an environmental checklist; a description of the environmental effects including whether the change could increase the potential to release a hazardous chemical or alter the composition of waste streams or emissions; the names of all personnel who might be affected by the change; the communication and training required; and the name of the person responsible for that communication and training.

20. SANDEL, as Unit Operations Leader, was responsible for reviewing and authorizing EOIs and CODs for the IBU. SANDEL was required to verify that all safety and environmental aspects of the proposed change had received adequate and appropriate scrutiny before granting authorization.

## COUNT ONE
### Knowing Violation of Requirement to Prevent Accidental Releases
[Failure to Implement Safe Work Practices]

**A.  INTRODUCTION**

The Grand Jury adopts, alleges, and incorporates herein the contents of the Introduction to this Indictment as if fully set out herein.

**B.  KNOWING VIOLATION OF RISK MANAGEMENT REQUIREMENT**

Beginning on or about July 2011 and continuing to November 15, 2014, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**E.I. DU PONT DE NEMOURS AND CO.** and
**KENNETH J. SANDEL**,

as owner and an operator of the Insecticide Business Unit, did knowingly violate a requirement of a regulation promulgated under the Clean Air Act, Title 42, United States Code, Section 7412(r)(7), to prevent accidental releases of regulated substances, specifically, Title 40, Code of Federal Regulations, Section 68.69(d), by failing to implement safe work practices to provide for the control of hazards during operations.

**C.  ADDITIONAL FACTS**

1. MeSH arrived at DUPONT's LaPorte plant from outside suppliers as a liquefied gas inside pressurized railroad cars. Workers unloaded the railcars at locations designated as railcar spots 1A4 and 1A2. The liquid MeSH was pushed out of the railcars by pressurized nitrogen gas through unloading hoses, a series of valves and a pipeline into a large outdoor tank called the MeSH storage tank.

7

2.      When needed in the Lannate and Vydate manufacturing process, MeSH was pumped from the storage tank through outdoor pipes back past railcar spots 1A4 and 1A2 into manufacturing equipment located inside an old four-story building.  One such pipe, the MeSH feed line, carried MeSH to a vessel called the MeSNa Cooler.

MeSH Vent Header

3.      The process of manufacturing Lannate and Vydate produced waste gas.  Several pipe systems carried the waste gas to the $NO_X$ Reducing Scrubbed ("NRS") incinerator installed in 2011 or to an older backup incinerator called the Lannate Vapor incinerator.

4.      The MeSH Vent Header was a pipe system that carried waste gas to the incinerators. The MeSH Vent Header was a "hazardous system" as defined by DUPONT's corporate standards and the LaPorte line break procedure because it was a line "that could contain material that is hazardous on contact or inhalation."

5.      The volume and concentration of waste gas flowing through the MeSH Vent Header varied with the stage of the manufacturing process and other factors including whether equipment functioned correctly and workers followed proper procedures.  The MeSH Vent Header had the potential to contain hazardous gas from many different sources including the following:

MeSH railcars.  After workers unloaded liquid MeSH from a railcar, they manually vented MeSH gas and nitrogen vapors that remained in the railcar and unloading hoses into the MeSH Vent Header through valves located at railcar spots 1A4 or 1A2.  Nitrogen was an inert gas that could kill people who inhaled it in high concentrations by displacing oxygen from air.  MeSH, as described above, was highly toxic.

MeSH storage tank.  MeSH gas and nitrogen vapors vented from the MeSH storage tank into the MeSH Vent Header through an automatic valve.

MeSH feed line. Workers sometimes manually vented MeSH gas and nitrogen from the MeSH feed line into the MeSH Vent Header through a valve on the feed line called the "burp valve".

7023 Reactor. MeSH gas and nitrogen from a manufacturing vessel called the 7023 Reactor vented into the MeSH Vent Header. This gas was a byproduct of reactions between toxic chemicals called sodium methyl mercaptide (MeSNa) and acetohydroxamyl chloride (AHC) and between corrosive chemicals called sodium hydroxide (NaOH) and hydrochloric acid (HCl).

West Slurry Hold Tank. MeSH, nitrogen and two other toxic gases, dimethyl disulfide (DMDS) and acetaldehyde oxime (AAO), vented from the West Slurry Hold Tank into the MeSH Vent Header.

Stripper Vent Condenser. MeSH, DMDS, AAO and a toxic chemical called S-Methyl-N-Hydroxythioacetimidate (MHTA) from a vessel called the Stripper Vent Condenser vented into the MeSH Vent Header.

7014 Reactor. A toxic gas called methanol and other non-chlorine gas from a vessel called the 7014 Reactor vented into the MeSH Vent Header. These waste gases were the byproduct of reactions between a toxic and corrosive chemical called sodium bisulfate, HCl, methanol and two other toxic chemicals: chlorine and A-2304.

7015 Reactor. MeSH gas vented from a vessel called the 7015 Reactor into the MeSH Vent Header. This waste gas was the product of a reaction between liquid MeSH from the storage tank, methanol, A-2304 and NaOH.

Methanol Recycle Tank. Methanol fumes from the Methanol Recycle Tank vented to the MeSH Vent Header.

Draining of the MeSH Vent Header

6.    A problem arose inside the MeSH Vent Header on the third floor of the

9

manufacturing building soon after the installation of the NRS incinerator. Specifically, a dark liquid of unknown composition sometimes accumulated at low points in the MeSH Vent Header piping near a three-way valve called the 18HV. This liquid blocked the passage of gas through the vent header and caused high pressure in manufacturing equipment that interfered with the production Lannate and Vydate.

7. To remove the unwanted liquid, IBU workers periodically opened drain valves on the MeSH Vent Header and let liquid flow out onto the building floor or into a bucket. IBU workers did this without implementing the LaPorte line break procedure and the practice was not the subject of any safety review. This practice continued for several years.

8. On February 9, 2014, an operator warned in an email – received by SANDEL – that IBU workers did not have a "safe and effective way" to drain the MeSH Vent Header on the third floor of the manufacturing building. The email suggested that operators drain the vent header by attaching a chemical hose to a valve on the vent header and placing the other end of the hose under the floor grate of a safety shower.

9. The next day, February 10, 2014, DUPONT engineers formally directed IBU operators in writing to drain the third floor MeSH Vent Header every shift in the manner described in the prior day's email. Engineers issued this directive without following DUPONT's procedures to manage changes or reviewing how it affected safety, health or the environment. For example, no one tested the liquid that came out of the vent header to learn what it was. Likewise, no one determined the chemical makeup of the gas inside the vent header, measured how much of that gas escaped when workers opened a drain valve or analyzed how that gas might affect exposed workers or the environment.

10. The method of draining the MeSH Vent Header described in the engineering directive violated the LaPorte line break procedure. Most significantly, the directive required

workers to open a drain valve to the atmosphere on a hazardous system without first clearing the system of chemical hazards.

11. During the remainder of 2014, IBU workers drained the MeSH Vent Header many times in the manner directed by DUPONT engineers.

12. This practice of draining the MeSH Vent Header without following the LaPorte line break procedure eventually contributed to the deaths of four DUPONT workers during the early morning hours of November 15, 2014, as described below in Section C of Count Two, adopted, alleged and incorporated herein.

13. As Unit Operations Leader of the IBU, SANDEL was responsible for making sure IBU employees took the critical safety steps required by the LaPorte line break procedure and did not release toxic chemicals inappropriately to the environment.

14. SANDEL knew the MeSH Vent Header had the potential to contain hazardous gases including MeSH. SANDEL reported to the LaPorte plant manager and others by email on November 14, 2014 – the evening of the fatal incident described above – that the MeSH Vent Header would contain MeSH gas that night.

15. SANDEL also knew that operators routinely opened the MeSH Vent Header on the third floor of his unit in a manner that violated the LaPorte line break procedure, and that fumes escaped from the vent header into the building, yet SANDEL allowed the practice to continue and did not implement the line break procedure.

In violation of Title 42, United States Code, Sections 7413(c)(1) and 7412(r)(7) and Title 18, United States Code, Section 2.

# COUNT TWO
**Knowing Violation of Requirement to Prevent Accidental Releases**
[Failure to Implement Written Procedures to Manage Changes]

### A.     INTRODUCTION

The Grand Jury adopts, alleges, and incorporates herein the contents of the Introduction to this Indictment and Section C of Count One as if fully set out herein.

### B.     KNOWING VIOLATION OF RISK MANAGEMENT REQUIREMENT

On or about November 14, 2014, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**E.I. DU PONT DE NEMOURS AND CO.** and
**KENNETH J. SANDEL**,

as owner and an operator of the Insecticide Business Unit, did knowingly violate a requirement of a regulation promulgated under the Clean Air Act, Title 42, United States Code, Section 7412(r)(7), to prevent accidental releases of regulated substances, specifically, Title 40, Code of Federal Regulations, Section 68.75, by failing to implement written procedures to manage changes.

### C.     ADDITIONAL FACTS

1.     On or about Thursday, November 13, 2014, IBU workers discovered that MeSH could not flow through the MeSH feed line from the MeSH storage tank to the MeSNa Cooler. The feed line had never been plugged in this manner before. Workers spent much of Thursday trying to get MeSH to flow through the feed line but they failed.

2.     The blockage did not require the IBU to shut down operations. Certain manufacturing vessels continued to function. However, the MeSNa Cooler and some downstream manufacturing vessels could not function without a continuous supply of MeSH.

3.     Around 10:00 am on Friday, November 14, 2014, SANDEL organized a meeting with DUPONT engineers and the day shift operations supervisor to troubleshoot the problem with

the MeSH feed line. The engineers suspected water had leaked from the MeSNa Cooler backwards into the feed line and theorized that low outdoor temperatures had caused the mixture of MeSH and water inside the feed line to freeze into a sludge. At the meeting, SANDEL and the engineers came up with an action plan.

4. The first step of the plan was to inject nitrogen into the MeSH feed line while opening a complicated series of valves at railcar spots 1A4 and 1A2 and the "burp valve" near the MeSNa Cooler to create pathways for nitrogen and MeSH inside the feed line to flow into the MeSH Vent Header. The next step of the plan was to pour hot water on the outside of a pump at the MeSH storage tank to melt any MeSH frozen inside. At some point, this step was expanded to include pouring hot water on the outside of the entire MeSH feed line. The next step of the plan, if necessary, was to take photos of the feed line with an infrared camera to investigate the blockage. The final step was to open the pump for inspection.

5. An engineer summarized the plan in a few sentences written on a flip chart in a conference room. Those sentences did not explain where along the MeSH feed line to place hot water hoses, how long to run the hot water, which specific valves to open at railcar spots 1A4 and 1A2, when to open those valves and the burp valve, how far to open each valve, how long to keep each valve open, whether to inject high-pressure nitrogen into the feed line while the hot water was running, how to prevent MeSH from entering the vent header in liquid form, how to determine when the blockage had cleared, whether to isolate the MeSH in the storage tank from the feed line, what use to make of the pump at the MeSH storage tank or when to attempt to restart flow of MeSH into the MeSNa Cooler.

Failure to Conduct an EOI

6. The plan to unplug the MeSH feed line that SANDEL and the engineers developed at the Friday meeting was a purposeful change in the way the Lannate manufacturing process

13

normally operated. No one had ever warmed the entire MeSH feed line with hot water or allowed hundreds of pounds of melted MeSH to flow from the MeSH feed line into the MeSH Vent Header through valves at railcar spots 1A4 or 1A2.

7. As a result, the federal safety regulation set out in Title 40, Code of Federal Regulations, Section 68.75 required SANDEL, as Unit Operations Leader, to implement DUPONT's written procedures to manage changes before putting the plan into action. Specifically, SANDEL was required to authorize an Experimental Operating Instruction (EOI).

8. An EOI should have included a step-by-step description of the plan to unplug the MeSH feed line and a written explanation of why the plan was safe. Furthermore, an EOI should have identified all personnel affected by the change – including operators who drained the MeSH Vent Header as a routine part of their job – and explained how to communicate the plan to those persons and how they would be trained to avoid hazards of the plan. SANDEL, in particular, would have been required to verify that all safety and environmental aspects of the proposed change had received adequate and appropriate scrutiny and that it was indeed safe to proceed.

9. However, SANDEL did not authorize an EOI or implement any other DUPONT procedure to manage change. No one created a written job plan or operating procedure that explained exactly how to put the Friday morning plan into action, or reviewed the safety, health or environmental impact of the plan. For example, no one analyzed how hundreds of pounds of MeSH flowing from the feed line into the MeSH Vent Header would affect IBU operators who routinely opened drain valves on the MeSH Vent Header. Most importantly, no one warned night shift operators in writing that the MeSH Vent Header could contain hundreds of pounds of MeSH that might escape through an open drain valve on the vent header and kill them.

10. After the Friday morning meeting ended, IBU day shift operators put the plan into action. They opened valves at railcar spots 1A4 and 1A2 to connect the MeSH feed line to the

14

MeSH Vent Header and blasted high-pressure nitrogen into the feed line. They also poked holes in insulation that surrounded the outside of the MeSH feed line, stuck hot water hoses under the insulation, strapped the hoses to the feed line and began dousing the outside of the feed line with extremely hot water.

11. The MeSH feed line was still plugged between railcar spot 1A4 and the MeSNa Cooler when the Friday day shift ended around 6 pm. At least one hose was pouring hot water on the exterior of the MeSH feed line and open valves at railcar spots 1A4 – and possibly 1A2 – leaving a pathway for MeSH melting inside feed line to flow into the MeSH Vent Header. SANDEL and DUPONT engineers departed for the day without leaving written instructions how to proceed. Instead, outgoing day shift operators orally briefed the incoming night shift.

Release of MeSH

12. IBU night shift operators continued to follow SANDEL's plan through the early morning hours of November 15, 2014. The MeSH and water mixture inside the MeSH feed line finally melted around 2:47 a.m. on Saturday, November 15, 2014. At the time, valves that connected the feed line to the MeSH Vent Header at railcar spot 1A2 were open, the MeSH storage tank pump was running and the storage tank was open to the feed line. As a result of this configuration of equipment, thousands of pounds of pure liquid MeSH began to flow from the MeSH storage tank into the MeSH feed line and then through the open valves at railcar spot 1A2 into the MeSH Vent Header.

13. The large volume of liquid MeSH flowing into the MeSH Vent Header caused high pressure in certain IBU manufacturing vessels. A DUPONT employee, believing erroneously that the high pressure was caused by the usual liquid buildup at low points in the MeSH Vent Header on the 3rd floor of the manufacturing building – and not knowing that the vent header was full of liquid MeSH – asked Crystle Wise, a new operator at the IBU, to drain the MeSH Vent Header as

was the usual practice. Around 3:00 a.m., Wise or her supervisor Wade Baker opened drain valves on the MeSH Vent Header at low points near the 18HV valve including the drain valve with the hose leading to the safety shower. Following longstanding IBU practice, no one sought a line break permit or took any safety steps required by the LaPorte line break procedure such as creating a written job plan, isolating the MeSH Vent Header, clearing it of chemical hazards, using respiratory protection, making an announcement over the plant public address system or barricading the area.

14. Liquid MeSH soon began to escape through the open drain valves and vaporize into the air inside the manufacturing building. Baker, standing about 30 feet from the drain valves, died on the spot from asphyxiation and acute exposure to MeSH. Wise radioed for help but died from the MeSH vapor as she tried to escape. A third operator, Robert Tisnado, ran into the building to help Wise and he too died from exposure to MeSH. Then a fourth operator, Gilbert Tisnado, was killed by the MeSH as he tried to save Robert Tisnado – his younger brother.

15. Over the next several hours, approximately 24,000 pounds of MeSH gas escaped into the air through open drain valves on the third floor MeSH Vent Header, injuring more DUPONT workers inside and outside the IBU manufacturing building and traveling downwind into the city of Deer Park, Texas, and beyond.

In violation of Title 42, United States Code, Sections 7413(c)(1) and 7412(r)(7) and Title 18, United States Code, Section 2.

## COUNT THREE
### Negligent Release of Extremely Hazardous Substance

**A. INTRODUCTION**

The Grand Jury adopts, alleges, and incorporates herein the contents of the Introduction to this Indictment, Section C of Count One and Section C of Count Two as if fully set out herein.

**B. RELEASE OF EXTREMELY HAZARDOUS SUBSTANCE**

On or about November 15, 2014, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**E.I. DU PONT DE NEMOURS AND CO.** and
**KENNETH J. SANDEL**,

negligently released and caused the release into the ambient air of an extremely hazardous substance listed pursuant to Title 42, United States Code, Section 11002(a)(2), that is, methyl mercaptan, and at the time negligently placed another person in imminent danger of death and serious bodily injury.

In violation of Title 42, United States Code, Section 7413(c)(4).

**A TRUE BILL:**

_____
FOREPERSON OF THE GRAND JURY

Ryan K. Patrick
United States Attorney

By: _John R. Lewis_____
JOHN R. LEWIS
Assistant United States Attorney