United States District Court
Southern District of Texas
**ENTERED**
January 18, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | CRIMINAL NO. H-21-16 |
| V. | § | |
| | § | |
| | § | |
| E.I. DU PONT DE NEMOURS AND CO. | § | |
| AND KENNETH J. SANDEL, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

This prosecution arises from the deaths of four DuPont workers after they were exposed to hazardous gas at the DuPont plant in LaPorte, Texas in November 2014.  On January 7, 2021, the grand jury returned a three-count indictment against DuPont and Kenneth Sandel.  Counts One and Two alleged knowing violations of the regulations designed to prevent accidental releases.  Count Three alleged the negligent release of an extremely hazardous substance.  As a result of tolling agreements, limitations reach back to November 7, 2014.  DuPont moves to dismiss Count One of the indictment based on the five-year statute of limitations.  The court held argument on the motion.  Based on the thorough briefs and arguments from all parties and the applicable law, the court dismisses Count One.  The reasons are stated below.

I.      **Background**

The Clean Air Act imposes criminal penalties against: [a]ny person who knowingly violates any requirement or prohibition of . . . section 7412 of this title . . . including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections.  42 U.S.C. § 7413(c)(1).  Congress required the EPA to publish regulations aimed at preventing and mitigating

accidental releases of hazardous substances. *See* 42 U.S.C. § 7412(r)(7). The EPA regulations at issue state:

> The owner or operator shall develop and **implement safe work practices to provide for the control of hazards during operations** such as lockout/tagout; confined space entry; opening process equipment or piping; and control over entrance into a stationary source by maintenance, contractor, laboratory, or other support personnel. These safe work practices shall apply to employees and contractor employees.

40 C.F.R. § 68.69(d) (emphasis added).

Count One alleges that DuPont and Sandel, the Unit Operations Leader of the Insecticide Business Unit, (together, "DuPont") violated 42 U.S.C. § 7413(c)(1) and 42 U.S.C. § 7412(r)(7) by knowingly violating the 40 C.F.R. § 68.69(d) requirement to "implement safe work practices to provide for the control of hazards during operations" at its Insecticide Business Unit in LaPorte. (Docket Entry No. 1 at 7).

Methyl Mercaptan (MeSH) is a toxic, colorless gas with a pungent odor. It is used in large quantities as a raw material in industrial products such as pesticides. The EPA classified MeSH as an extremely hazardous substance under 42 U.S.C. § 11002(a)(2). The indictment alleges that a high concentration of MeSH will result in a quick death by asphyxiation. (Docket Entry No. 1 at 2).

Count One alleges that DuPont violated § 68.69(d), a regulation promulgated under § 7412(r)(7), "[b]eginning on or about July 2011 and continuing to November 15, 2014," by failing to implement safe work practices to provide for the control of hazards during operations. (Docket Entry No. 1 at 7). The hazards and operations involved draining a MeSH Vent Header in the Insecticide Business Unit of the LaPorte plant. The MeSH Vent Header is a pipe system that carried waste gas to the plant incinerators. The indictment alleges that the MeSH Vent Header

was a "hazardous system" under DuPont's corporate standards because it "could contain material that is hazardous on contact or inhalation."  (Docket Entry No. 1 at 8).

DuPont created the LaPorte Line Break Procedure, which specified steps for carrying out line breaks.  The Line Break Procedure required a qualified employee to prepare a written job plan before opening any hazardous system.  The job plan would identify the hazards of the line break, explain how to control them, describe the necessary personal protective equipment, and provide contingency plans.  (Docket Entry No. 1 at 5).  The Line Break Procedure required a supervisor and other DuPont employees working on the operation to sign off on the job plan and issue a line break permit.  (Docket Entry No. 1 at 5).

The indictment alleges that DuPont employees drained valves without following the safe work practices set out in the Line Break Procedure, and that this behavior continued for many years.  (Docket Entry No. 1 at 10).  In 2011, DuPont installed the NOX Reducing Scrubbed incinerator, a new incinerator for waste gas.  The MSH Vent Header carried waste gas to this incinerator.  Soon after the new incinerator was installed in 2011, "a dark liquid of unknown composition" accumulated at points in the MeSH Vent Header, which blocked the gas flow. (Docket Entry No. 1 at 10).  The indictment alleged that "[Insecticide Business Unit] workers periodically opened drain valves on the MeSH Vent Header and let liquid flow out onto the building floor or into a bucket."  (Docket Entry No. 1 at 10).  The indictment alleged that the workers did this for several years without any safety review of the practice.  (Docket Entry No. 1 at 10).

On February 9, 2014, an operator sent an email to Sandel explaining that workers did not have a "safe and effective way" to drain the MeSH Vent Header on the third floor of the manufacturing building.  (Docket Entry No. 1 at 10).  The email suggested a process for draining

3

the vent header.  The following day, DuPont employees directed the operators to follow the process described in the email.  (Docket Entry No. 1 at 10).  The indictment alleged that this process violated the Line Break Procedure by instructing workers to "open a drain valve to the atmosphere on a hazardous system without first clearing the system of chemical hazards."  (Docket Entry No. 1 at 11).  The indictment alleged that Sandel "was responsible for making sure [Insecticide Business Unit] employees took the critical safety steps required by the LaPorte line break procedure and did not release toxic chemicals inappropriately to the environment."  (Docket Entry No. 1 at 11).  Sandel allegedly knew that the MeSH Vent Header had the potential to contain hazardous gases and that operators "routinely" violated the LaPorte Line Break Procedure. (Docket Entry No. 1 at 11).

Count One alleged that DuPont and Sandel violated the Line Break procedure on February 10, 2014, and November 14 and 15, 2014, when operators drained the MeSH Vent Header without implementing safe work practices.  (Docket Entry No. 1 at 10–11).  The indictment alleged that "[f]ollowing longstanding [Insecticide Business Unit] practice, no one sought a line break permit or took any safety steps required by the LaPorte line break procedure such as creating a written job plan, isolating the MeSH Vent Header, clearing it of chemical hazards, using respiratory protection, making an announcement over the plant public address system or barricading the area." (Docket Entry No. 1 at 16).  In the early hours of November 15, 2014, liquid MeSH escaped through open values and vaporized into the air.  Four DuPont workers died from asphyxiation and acute exposure.

DuPont argues that neither the statutes nor the regulations made on the basis of Count One are continuing offenses, meaning the government needed to allege distinct violations within the statute of limitations rather than an ongoing three-year failure to implement safe work practices to

control hazards in draining the MeSH Vent Headers.  DuPont argues that Count One could be read to charge "many distinct violations taking place over a three-year period, and those instances occurring before November 7, 2014, are untimely."  (Docket Entry No. 31 at 7).  DuPont argues that Count One could alternatively be read to charge conduct that was completed in 1999 or 2011, which would be outside the limitations period.  DuPont argues that to the extent the charge includes timely allegations of failing to follow the Line Break procedures on November 14 and 15, 2014, that conduct does not violate 40 C.F.R. § 68.69(d).  DuPont moves to dismiss Count One.

## II.    Legal Standards

Under Federal Rule of Criminal Procedure 12(b), a party may challenge an indictment for failing to state an offense.  "The propriety of granting a motion to dismiss an indictment . . . by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact. . . . If a question of law is involved, then consideration of the motion is generally proper."  *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir.2005)).  "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated."  *United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017) (quoting *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999)).  "This court interprets regulations in the same manner as statutes, looking first to the regulation's plain language." *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016).  "Where the language is unambiguous, we do not look beyond the plain wording of the regulation to determine meaning."  *Id.* (quoting  Anthony v. United States, 520 F.3d 374, 380 (5th Cir.2008)).  "[W]here, as here, a regulatory violation carries criminal penalties, the regulation 'must be strictly construed and cannot be enlarged by analogy or expanded beyond

the plain meaning of the words used.'" *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 482 (5th Cir. 2015) (quoting *United States v. Clark*, 412 F.2d 885, 890 (5th Cir. 1969)).

## III.    Analysis

### A.    Whether Sections 7413(c)(1) and 7412(r)(7) Create Continuing Offenses

The doctrine of continuing offenses is a qualification to the general principal that the statute of limitations runs when the crime is complete.  *United States v. Tavarez-Levario*, 788 F.3d 433, 436 (5th Cir. 2015).   "The Supreme Court has defined 'continuing offense' to include 'a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy.'"  *Id.* (quoting *United States v. Brazell*, 489 F.3d 666, 668 (5th Cir.2007)).   "The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that each day brings a renewed threat of the evil Congress sought to prevent even after the elements necessary to establish the crime have occurred." *Id.* at 436–37 (quoting *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir.1999)).  The statute of limitations for a continuing offense does not begin to run until the ongoing commission of the crime ends.  *Id.* at 437.

The Supreme Court has explained that "[t]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term."  *Toussie v. United States*, 397 U.S. 112, 115 (1970). As a result, "a crime is not to be construed as a continuing offense unless (1) 'the explicit language of the substantive criminal statute compels such a conclusion,' or (2) 'the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.'" *Tavarez-Levario*, 788 F.3d at 437 (quoting *Toussie*, 397 U.S. at 114–15). "[T]he analysis

of whether a crime constitutes a continuing offense involves examining the offense itself, not the defendant's particular conduct." *Tavarez-Levario*, 788 F.3d at 440.

As to the first *Toussie* inquiry, the Fifth Circuit has explained that in some statutes, "Congress has explicitly stated that a crime is a continuing offense." *Tavarez-Levario*, 788 F.3d at 437 (citing 18 U.S.C. § 3284 ("The concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense....."); 22 U.S.C. § 618(e) ("Failure to file any such registration statement or supplements thereto ... shall be considered a continuing offense for as long as such failure exists[.]")).  A statute that does not describe a continuing offense should not be interpreted to cover ongoing conduct.  *Toussie*, 397 U.S. at 120 ("any argument based on congressional silence is stronger in favor of not construing this Act as incorporating a continuing-offense theory.").  A statute may establish a continuing offense by "language which would indicate that the offense involves ongoing conduct." *Tavarez-Levario*, 788 F.3d at 438.

In *Toussie*, the defendant failed to register for the draft.  He was indicted eight years after he should have registered.  397 U.S. at 114.  The government argued that the crime continued each day that the defendant did not register.  *Id.*  The Supreme Court established the test for continuing offenses described above and concluded that the statute was not a continuing offense.  The Court explained:

> While it is true that the regulation does in explicit terms refer to registration as a continuing duty, we cannot give it the effect of making this criminal offense a continuing one. Since such offenses are not to be implied except in limited circumstances, and since questions of limitations are fundamentally matters of legislative not administrative decision, we think this regulation should not be relied upon effectively to stretch a five-year statute of limitations into a 13-year one, unless the statute itself, apart from the regulation, justifies that conclusion[.]

*Toussie*, 397 U.S. at 120–21.

Count One alleged violations of the following statutes:

- 42 U.S.C. § 7413(c)(1), which  imposes criminal penalties against "[a]ny person who knowingly violates any requirement or prohibition of . . . section 7412 of this title . . . including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections or subchpaters"; and

- 42 U.S.C. § 7412(r)(7), which authorizes the EPA to issue accident prevention regulations and makes it "unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement."

Unlike the examples listed in *Tavarez-Levario*, which used the words "continuing offense," these statutes do not explicitly state that the crime is a continuing offense.  In *United States v. Del Percio*, 870 F.2d 1090 (6th Cir. 1989), the Sixth Circuit applied *Toussie* to the Atomic Energy Act.  The Act prohibited the willful violation of any regulation issued by the Nuclear Regulatory Commission.  *Id.* at 1095.  The relevant regulations required covered entities to have a plan for making and implementing plant modifications.  *Id.*  The defendant nuclear plant owner, was indicted for failing to submit plans and failing to make the requisite modifications to bring the facility into compliance with the regulations.  *Id.* at 1092.  The court found "no explicit language in these statutory provisions which compels the conclusion" that the crimes were continuing offenses.  *Id.* at 1096.  The court noted that the statutes did not "even mention[] the statute of limitations."  *Id.*  Similarly, §§ 7412(r)(7) and 7413(c)(1) do not "indicate that the offense involves ongoing conduct" or have "language . . . that clearly contemplates a prolonged course of conduct." *Tavarez-Levario*, 788 F.3d at 438 (quoting *Toussie*, 397 U.S. at 120).

The second *Toussie* inquiry is into the nature of the offense.  The court considers whether the offense alleged necessarily requires "ongoing perpetration, which produces an ongoing threat of harm."  *Tavarez-Levario*, 788 F.3d at 439 (citing *United States v. Brazell*, 489 F.3d 666, 668 (5th Cir. 2007); *United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999)).  "The prototypical continuing offense is conspiracy, which 'continues as long as the conspirators engage in overt acts

8

in furtherance of their plot,' and 'each day's acts bring a renewed threat of the substantive evil Congress sought to prevent.'" *Tavarez-Levario*, 788 F.3d at 439 (quoting *Toussie*, 397 U.S. at 122). Other examples are "offenses that prohibit an individual from remaining in an unlawful condition or status," such as escape, *United States v. Bailey*, 444 U.S. 394, 413 (1980); willfully remaining in the United States as an illegal alien, *United States v. Cores*, 356 U.S. 405, 408 (1958); failing to appear for sentencing because of the ongoing obligation to face sentencing, *United States v. Gray*, 876 F.2d 1411, 1419 (9th Cir.1989); and kidnapping, *United States v. Garcia*, 854 F.2d 340, 343–44 (9th Cir.1988). In *Toussie*, the court concluded that "[f]ailing to register is not like a conspiracy which the Court has held continues as long as the conspirators engage in overt acts in furtherance of their plot." *Id.* at 122.

The government argues that § 7412(r) describes a continuing offense because the statute was intended to "prevent the accidental release and to minimize the consequences of any such release of any . . . extremely hazardous substance." (Docket Entry No. 37 at 51 (citing 42 U.S.C. § 7412(r)(1)). The government argues that "the word 'prevent' therefore comprehends continuing conduct." (Docket Entry No. 37 at 51). The government relies on the requirement in 42 U.S.C. § 7412(r)(1) for operators "to identify hazards . . . , to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur." (Docket Entry No. 37 at 51). The government argues that the word "maintain" is enough because it "comprehends continuing conduct." (Docket Entry No. 37 at 51). Finally, the government relies on the language in § 7412(r)(7)(B)(i) requiring the EPA to "promulgate reasonable regulations . . . to provide, to the greatest extent practicable, for the prevention and detection of accidental releases . . . ." The government argues that "Congress must have wanted

EPA to create safety obligations that continued over time because that provides greater protection than obligations that expire." (Docket Entry No. 37 at 51).

The government's extensive discussion of the history, purpose, and importance of these regulations is interesting but not decisive under *Toussie*. *See Del Percio*, 870 F.2d at 1096 ("We do not believe that the *Toussie* doctrine permits us to construe offenses as continuing ones based upon our perception of the seriousness of the crimes charged."). The defendants explain that if the word "maintain" in § 7412(r) establishes that 40 C.F.R. § 68.69(d)—one of numerous regulations promulgated under Section 7412(r)(7)(B)(i)—is a continuing offense, then every subpart of Part 68 would be a continuing offense. This would be inconsistent with *Delek Ref. Ltd. v. OSHRC*, in which the Fifth Circuit held that two subparts of OSHA regulations, 29 C.F.R. §§ 1910.119(e)(5) and (o)(4), similar to 40 C.F.R. §§ 68.67(e) and 68.79(d), are not continuing offenses. 845 F.3d 170, 178 (5th Cir. 2016).

DuPont argues that even if failing to "follow" the Line Break Procedure amounts to a violation of § 68.69, and therefore of 42 U.S.C. § 7413, a "company that periodically drains a vent-header could follow its line-break policy during one draining, then drain a month later without following the policy, then drain again a month later in compliance." (Docket Entry No. 31 at 19). All the acts necessary to commit a violation would be complete each time the improper draining happened; each would be a discrete violation. DuPont argues that the fact that operators may fall in and out of compliance with the regulations on a daily basis, and therefore in and out of compliance with the statutory prohibitions of "knowingly violat[ing]" or "operat[ing] . . . in violation of" the regulations, means that the nature of the crime is not "inherently" continuing. *See* §§ 7412(r)(7), 7413(c)(1). Both the statute and the regulations are consistent with DuPont's argument.

10

In *Del Percio*, the Sixth Circuit looked to the regulations as "the substantive bases for the charged offenses," concluding that there was "nothing inherent about failing to submit accurate reports or make plant modifications which demands that these actions (or omissions) be construed as continuing crimes." 870 F.2d at 1097. Accepting the government's interpretation—for the moment—that "implement," includes "following" the safety protocols, there is nothing inherently continuous about the alleged failure to follow the Line Break Procedure on some days. The government distinguishes *Del Percio* because the regulations in that case required that the plans for plant modifications were implemented by a certain date. DuPont responds that the Risk Management Programs under the Clean Air Act § 112(r)(7), 61 Fed. Reg. 31,668, (June 20, 1996), set a compliance deadline for June 21, 1999. 40 C.F.R. § 68.10. Under the government's logic, a compliance deadline counsels against interpreting the Clean Air Act to be a continuing offense.

The government focuses its response on urging that Count One alleged illegal conduct that occurred both before and after the limitations period, precluding dismissal. (Docket Entry No. 37 at 12). The government relies on *United States v. Bustamante*, 45 F.3d 933, 942 (5th Cir. 1995), in which the court explained that "[Bustamante] was charged with accepting illegal gratuities over an extended period of time. . . . Bustamante was therefore charged with continuing criminal behavior." The court in *Bustamante* acknowledged that under *Toussie*, "the doctrine of continuing offenses should be applied sparingly," but did not apply *Toussie*. *Id.* at 942. The case is readily distinguished. Bustamante was charged with accepting an illegal gratuity and with RICO violations. *Id.* at 935–36. An element of RICO is "two related predicate acts that constitute a threat of continuing racketeering activity." *Id.* at 941. The court described Bustamante's acceptance of the illegal gratuity as "not merely . . . accepting these particular guarantees and promises," but as a "broader investment scheme of which these loans were a part." *Id.* at 940. As

a result, the court found that this alleged continuing criminal behavior was within the limitations period. *Id.* at 942. This interpretation, however, is inconsistent with *Toussie*'s instruction, later affirmed by the Fifth Circuit, that "the analysis of whether a crime constitutes a continuing offense involves examining the offense itself, not the defendant's particular conduct." *Tavarez-Levario*, 788 F.3d at 440 (citing *Toussie*, 397 U.S. at 115). *Bustamante* did not apply *Toussie*, making it unhelpful here.

The government also relies on *United States v. Samson*, 433 F. Supp. 3d 1046 (S.D. Tex. 2020), which denied a motion to acquit a defendant convicted of fraudulently using social security benefits that were deposited in joint bank accounts in his deceased parents' names. *Id.* at 1049. The defendant argued that the government failed to prove that he knowingly stole or converted the Social Security benefits within the limitations period. *Id.* at 1053. The conduct occurred over 22 years, and the defendant argued that the conviction was barred by the statute of limitations. *Id.* at 1049. The court concluded that a theft or knowing conversion under 18 U.S.C. § 641 was not a continuing offense. *Id.* at 1054. "A violation under § 641(a) is complete as soon as the offender unlawfully takes or misappropriates money . . . of the United States." *Id.* As the court explained, "[t]hat the conduct described in the statute can sometimes be part of a covert, long-term scheme to repeatedly steal small sums of money does not unequivocally show the crime is by its nature continuing as *Toussie* requires." *Id.* at 1053.

The *Samson* court held that the theft or knowing conversion was within the five-year status of limitations because the defendant withdrew the money within the limitations period, knowing that it was mistakenly deposited and did not belong to him. The government cites *Samson* to argue that a charge is not barred by the statute of limitations if it alleges conduct both before and after the limitations period. But *Samson* did not find that the offense was a continuing violation.

Instead, the court concluded that the evidence showed that the defendant made "dozens of withdraws," knowing that the money did not belong to him within the limitations period. *Id.* at 1054–55. The court concluded that the evidence showed that discrete violations occurred within the statute of limitations. *Samson* does not show that the government alleges a continuing offense by simply charging some conduct inside the limitations period.

In sum, the cases the government cites do not supplant *Toussie*. Because neither the charged statutes, nor the government's interpretation of the regulation, supports a continuing offense, the only offense alleged within the statute of limitations is after November 7, 2014.

**B.     The Meaning of "implement" in 40 C.F.R. § 68.69(d)**

The next consideration is whether the facts alleged in Count One, taken as true, allege a violation of 40 C.F.R. § 68.69(d) after November 7, 2014. This requires deciding whether the alleged failures to follow the Line Break Procedures after November 7, 2014, are failures to "implement safe work practices" in violation of 40 C.F.R. § 68.69(d).

DuPont argues that "implement" means "to establish procedures by which a practice is to be executed in the future." (Docket Entry No. 31 at 25). DuPont argues that 40 C.F.R. § 68.69(d) is violated only by a failure to create a plan for the safe practices, but not by failing to perform the practices set out in the plan.

The defendants put in place three alternative dates from which the statute of limitations could run. The first is that 40 C.F.R. § 68.69(d), with the overall Risk Management Program rule under the Clean Air Act, required DuPont to implement its Risk Management Program  by June 21, 1999. Under this approach, because the regulation and rule did not impose an ongoing obligation to follow the established safety protocols after this date, the statute of limitations would run from June 21, 1999. (Docket Entry No. 39 at 9). The second approach is that the statute of

13

limitations began to run after DuPont installed the NRS incinerator in 2011.  It was this installation that led to the steps that gave rise to the duty to implement the Line Break Procedure for drainage operations.   (Docket Entry No. 31 at 25).  The third approach is that the duty arose when an operator suggested a new method to drain the vent header in February 2014.  (Docket Entry No. 31 at 25).  The court does not need to resolve whether a violation of 40 C.F.R. § 68.69 occurred on all, or any, of these dates.  They are all outside the statute of limitations.  The issue then is whether the alleged conduct that took place after November 7, 2014, was a "failure to implement" under 40 C.F.R. § 68.69.

The government argues that to "implement" safe practices includes, but is not limited to, "following" the practices, and that the court should give deference to the EPA on the meaning of the word "implement" under *Auer v. Robbins*, 519 U.S. 452 (1997).  The three steps are developing (creating), implementing (putting into place), and performing (actually doing).  DuPont responds that "implement" means to put into place, which is different from actually doing.  DuPont also argues that no *Auer* deference is due.

In *United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017), the Fifth Circuit refused to give deference to the Bureau of Safety and Environmental Enforcement's "novel" interpretation of "you" in a regulation that the defendants were criminally charged with knowingly and willfully violating.  The court explained that "this is no civil enforcement proceeding where 'only' money is at stake. '[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope[.]'"  *Moss*, 872 F.3d at 315 (quoting *United States v. Lanier,* 520 U.S. 259, 266 (1997)).  "Where, as here, a regulatory violation carries criminal penalties, the regulation 'must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words

14

used.'" *Moss*, 872 F.3d at 308 (quoting *CITGO Petroleum Corp.*, 801 F.3d at 482).  "If this case involved only civil sanctions against the appellees, the government would perhaps ask this court to apply *Auer* deference to its interpretation of the regulations." *Id.* at 314.

The government also relies on a recent decision from the Sixth Circuit, in which the court applied *Chevron* deference in interpreting a regulation that carries criminal penalties.  *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 902 (6th Cir. 2021).  *Gun Owners* involved an Administrative Procedure Act challenge to a final rule promulgated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  The Sixth Circuit concluded that "*Chevron* does not fall away simply because a challenged legislative rule has some criminal applications," because "*Chevron* itself involved an agency interpretation with criminal applications[.]"  *Id.* at 900–01.  The court distinguished between the facial challenge at issue and the application of a regulation with criminal penalties in "a specific factual situation."  *Id.* at 902.  The court relied on *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, in which the Supreme Court explained that "[w]e have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement." *Gun Owners of Am*, 19 F.4th at 901 (quoting *Babbitt*, 515 U.S. 687, 703–04 (1995)).  And the court acknowledged that applying *Chevron* in a facial review of an administrative regulation does not undermine the rule that, "a law imposing criminal sanctions—whether it be a statute or a regulation—must provide fair notice of the prohibited conduct." *Id. Gun Owners of America* does not erode the rule of lenity's application in the context of a criminal prosecution.

*Moss* makes clear that the rule of lenity and prior notice to the defendant override agency deference in a criminal prosecution.  The government argues that *Moss* applies only to "novel" interpretations of a regulation, and that here, the EPA has consistently interpreted "implement" as

meaning "to follow."  (Docket Entry No. 37 at 25).  The government argues that the "EPA (and OSHA) have filed many actions over the past two decades charging an entity with having failed to 'implement,' fully implement or adequately implement a plan, procedure program or practice." (Docket Entry No. 37).  The governments cites to consent agreements and press releases related to "failing to implement" a Risk Management Plan under 40 C.F.R. Part 68.

It is not clear that consent agreements or press releases amount to an "interpretation," in the same way as an agency's legislative rule.  To receive *Auer* deference, an interpretation must be "the agency's 'authoritative' or 'official position,' rather than [an] ad hoc statement not reflecting the agency's views."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019).  But even if the consent agreements established the agency's authoritative position, the defendants note that none of the enforcement actions cited by the government involved the regulation at issue here, Part 68.69(d), except *In re Tyson Foods, Inc. Consent Agreement*, CAA-04-2014-1501(b), 2014 WL 1651529 (E.P.A. Jan. 15, 2014).  This is insufficient to establish a consistent interpretation of the meaning of "implement" as used in Part 68.69(d), and insufficient to address the concerns raised in *Moss*.

The government and DuPont both argue that the dictionary definitions of "implement" support their constructions of the statute.  The government cites to dictionary meanings such as "to give practical effect to and ensure of actual fulfillment by concrete measures" and "to make something such as an idea, plan, system, or law start to work and be used."  Implement, *Merriam Webster.com Dictionary*, www.merriam-webster.com/dictionary/implement; Implement, *Macmillan Dictionary*, www.macmillandictionary.com/us/dictionary/american/implement_1. The government also cites to *Fowler's Dictionary of Modern English Usage* which explains that "implement" "came into usage first in Scottish legal language at the beginning of the 19c. in the

now widespread sense 'to complete, carry into effect (a contract, agreement, etc.); to fulfill (an undertaking).'" *Fowler's Dictionary of Modern English Usage* (4th ed. 2015).

DuPont responds that the dictionaries cited by the government also support interpreting "implement" to mean "to initiate or put into practice—an act that has an ending." (Docket Entry No. 39 at 9). DuPont cites to *Macmillan*'s definition of "to make something such as an idea, plan, system, or law start to work and be used," the *Oxford English Dictionary* definition of "to complete, perform, carry into effect (a contract, agreement, etc.); to fulfil (an engagement or promise) . . . ," and the *Merriam-Webster's Advanced Learners English Dictionary* definition of "to begin to do or use (something, such as a plan)[.]" (Docket Entry No. 39 at 9 (citing Docket Entry No. 37 at 20–22)).

*Black's Law Dictionary* does not define "implement," but it does define "implementation plan": "[a]n outline of steps needed to accomplish a particular goal; esp., in environmental law, a detailed outline of the timing and sequence of measures to be taken to meet environmental-quality standards by a specified time." Implementation Plan, *Black's Law Dictionary* (11th ed. 2019). To the extent the meaning of "implement" is ambiguous, the rule of lenity applies. *United States v. Santos*, 553 U.S. 507, 514 (2008). As the Supreme Court has explained, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.'" *Toussie*, 397 U.S. at 122.

*Delek* is helpful. The regulations at issue required employers to "assure that [process hazard analysis] recommendations are resolved in a timely manner … [and] complete actions as soon as possible," and "promptly determine and document an appropriate response to each of the

findings of [a] compliance audit, and document that deficiencies have been corrected." *Delek*, 845 F.3d at 174 n.1, n.3 (citing 29 C.F.R. § 1910.119(e)(5); 29 C.F.R. § 1910.119(o)(4)).  The court explained that under these regulations, the "employer is under no obligation to actually implement that recommendation," noting that "this structure is quite unlike a safety regulation which commands the employer to actually remedy a safety hazard and maintain a workplace free of such hazards, and it distinguishes subsections (e)(5) and (o)(4) from the type of safety-related regulation for which a continuing violations theory might be appropriate." *Delek*, 845 F.3d at 178.  The government argues that *Delek* supports finding a continuing violation of § 68.69(d) in the November 2014 conduct alleged in Count One because the failure alleged is of an ongoing duty to remedy a safety hazard similar to the hazard that the court described in *Delek*. (Docket Entry No. 37 at 53–54).

Section 68.69 requires owners and operators "develop and implement safe work practices" for addressing safety hazards.  Other provisions in Part 68 require that the safety regulations are followed.  Section 68.75 requires that changes to processes that involve hazard materials be communicated to those employees who are affected by the change.  Section 68.77 requires a safety review before implementing safety changes.  Some sections specifically use the word "follow": 40 C.F.R. § 68.79(a) requires a compliance audit every 3 years "to verify that procedures and practices developed under this subpart are adequate and are being *followed*"; and § 68.87(c)(4) requires that "the contract owner or operator shall assure that each contract employee *follows* the safety rules of the stationary source including the safe work practices required by § 68.69(d)."  As DuPont points out, if "implement" in § 68.69 and "followed" in § 68.79(a) were synonymous, then "every 'deficiency' identified in a compliance audit would be a failure to implement and a federal crime, even if prior audits had not found that deficiency."  (Docket Entry No. 39 at 10).

Courts apply the same interpretive framework to regulations as to statutes. *CITGO Petroleum Corp.*, 801 F.3d at 482. "A familiar principle of statutory construction, . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006). If the EPA meant "to follow," it would have said so, as it did in other subparts of Part 68. *See also Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("'[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"). "It is our duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quotations and citation omitted). The difference in words used is properly interpreted as a difference in meaning. The court agrees with the government that "implement" means something more than to "create" or "develop" a safe practices plan. But the court agrees with DuPont that it must mean something different from "following" the safe practices. The court interprets 40 CFR § 68.69(d) to require owners and operators to develop the steps to carry out the safe work practices, to have a plan to put those steps into practice or effect. This provision does not require DuPont to perform the steps.

As DuPont explains that "[n]o one disputes that companies are required to create, implement, and then follow safe work practices. But this motion is about the specific regulation under which the government has chosen to charge Count One—40 C.F.R. § 68.69(d)—and whether that specific regulation means what the government is claiming it means." (Docket Entry No. 39 at 8). As with the regulation at issue in *Delek*, § 68.69(d) does not require an owner or operator to "remedy a safety hazard and maintain a workplace free of such hazards." *See Delek*,

19

845 F.3d at 178. It requires only that the owner and operator develop and implement a plan to address the safety hazards.

The government additionally cites to Judge Posner's opinion in *Dukane Precast, Inc. v. Perez*, which involved an OSHA requirement that facilities "develop and implement procedure for summoning rescue and emergency services, for rescuing entrants from permit spaces, for providing necessary emergency services to rescued employees, and for preventing unauthorized personnel from attempting a rescue." 785 F.3d 252, 253 (7th Cir. 2015) (quoting 29 C.F.R. § 1910.146(d)(9)). Judge Posner rejected the argument that this regulation required only the employer to adopt emergency and rescue procedures, but did not require that the employer "actually call 911 or prevent coworkers from attempting a rescue." *Dukane*, 785 F.3d at 255. Judge Posner explained, "That may be a permissible literal interpretation, but it is neither inevitable nor sensible, as it would allow the employer to do nothing at all to rescue a worker injured or endangered at work—not even call 911. Literalism frequently, and in this instance, leads to absurd results." *Id.* Judge Posner's opinion involved a different regulation and civil, not criminal, enforcement. And his concerns are addressed by the other provisions of the EPA regulations that require the facilities to follow their procedures. *Dukane* does not weigh in favor of a different outcome here.

The allegations in Count One describing the defendants conduct on November 14 and 15, 2014, alleged only the failure to follow the Line Break Procedure. The allegations are not of a failure to implement a safety practice. The allegations include that, "[t]his practice of draining the MeSH Vent Header without following the LaPorte line break procedure eventually contributed to the deaths of four DUPONT workers," "SANDEL was responsible for making sure IBU employees took the critical safety steps required by the LaPorte line break procedure," "SANDEL

also knew that operators routinely opened the MeSH Vent Header on the third floor of his unit in a manner that violated the LaPorte line break procedure,  and that fumes escaped from the vent header into the building, yet SANDEL allowed the practice to continue and did not implement the line break procedure."  (Docket Entry No. 1 at 11).  The indictment alleged that the failure to follow the Line Break Procedure amounted to not "implementing" it.  But the allegations are that there was a Line Break Procedure and that it was in place.  It was "implemented."  The conduct alleged is the failure to take the next step—performance—a step not required by the regulation. The government has failed to allege a violation of 40 C.F.R. § 68.69(d).

## IV.   Conclusion

The defendants' motion to dismiss Count One of the indictment, (Docket Entry No. 31), is granted.

SIGNED on January 18, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge