## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CRIMINAL NO. 4:21cr16 |
| v. | § | |
| | § | |
| E.I. DU PONT DE NEMOURS AND CO. | § | 42 U.S.C. §§ 7413(c)(1) and |
| and | § | 7412 (r)(7) |
| KENNETH J. SANDEL. | § | 18 U.S.C. § 2 |
| | § | 41 U.S.C. § 7413(c)(4) |
| Defendants. | § | |
| | § | |

---

## REPLY IN SUPPORT OF
## DEFENDANT E.I. DU PONT DE NEMOURS AND CO.'S
## MOTION TO DISMISS COUNT THREE OF THE INDICTMENT
## FOR FAILURE TO STATE AN OFFENSE

---

# TABLE OF CONTENTS

Introduction ................................................................................................. 1

Argument ...................................................................................................... 2

    I.    Congress Intended That The Regulatory Definition Of Ambient Air Apply To Negligent Endangerment Crimes .................................................. 2

    II.   Applying The Regulatory Definition Of Ambient Air Does Not Lead To Absurd Results Or Render The Affirmative Defense To Knowing Endangerment Inapplicable ......................................................... 10

    III.  The Government's Attempts To Distinguish *Ho* And Similar Cases Are Unavailing ................................................................................. 11

    IV.   To The Extent The Term "Ambient Air" Is Ambiguous, DuPont's Due Process Right To Fair Notice And The Rule Of Lenity Dictate Application Of The Regulatory Definition ................................................. 13

    V.   The Indictment Fails to Allege An Offense Because It Does Not Contain Any Facts Indicating That The Negligent Release Caused Imminent Danger .......................................................................... 14

    VI.  Facts Alleged Outside The Indictment Cannot Cure Fair Notice Deficiencies .................................................................................. 16

Conclusion ................................................................................................ 18

Page(s)

CASES

*Appalachian Power Co. v. EPA*,
135 F.3d 791 (D.C. Cir. 1998) ................................................................ 2

*Bragdon v. Abbott*,
524 U.S. 624 (1998) ................................................................................ 3

*Environmental Defense v. Duke Energy Corp.*,
549 U.S. 561 (2007) ................................................................ 4, 5, 11, 12

*F.A.A. v. Cooper*,
566 U.S. 284, 292 (2012) ........................................................................ 2

*Lorillard v. Pons*,
434 U.S. 575 (1978) ................................................................................ 3

*McDermott Int'l, Inc. v. Wilander*,
498 U.S. 337 (1991) ................................................................................ 2

*Russell v. United States*,
369 U.S. 749 (1962) .............................................................................. 17

*Teva Pharms. USA, Inc. v. United States Food & Drug Admin.*,
514 F. Supp. 3d 66 (D.D.C. 2020) .......................................................... 3

*United States v. Bittner*,
19 F.4th 734 (5th Cir. 2021) .................................................................... 2

*United States v. Borowski*,
977 F.2d 27 (1st Cir. 1992) .................................................................... 11

*United States v. Cooper*,
714 F.3d 873 (5th Cir. 2013) ................................................................ 16

*United States v. Gonzales*,
121 F.3d 928 (5th Cir. 1997) ................................................................ 17

*United States v. Ho*,
No. H-00-183, ECF 92 and 94 (S.D. Tex. Nov. 17, 2000) ........................ 11

*United States v. Hylton*,
308 F. App'x 262 (10th Cir. 2009) ........................................................ 16

*United States v. Lanier,*
    520 U.S. 259 (1997) .................................................................................... 13

*United States v. Little,*
    308 F. App'x 256 (10th Cir. 2009) ............................................................ 16

*United States v. Margiotta,*
    No. 1:17-cr-00143 (D. Mont. Sept. 27, 2019), ECF 121 ........................... 12

*United States v. O'Connell,*
    Case No. 17-CR-50, 2017, 2017 WL 9360868 (E.D. Wis. Sept. 5, 2017) ........... 10, 11

*United States v. O'Connell,*
    Case No. 17-CR-50, 2017 WL 4675775 (E.D. Wis. Oct. 17, 2017) ......................... 11

*United States v. Pineda-Doval,*
    614 F.3d 1019 (9th Cir. 2010) ................................................................... 15

*United States v. Resendiz–Ponce,*
    549 U.S. 107 (2007) .................................................................................... 16

*United States v. Schmitz,*
    634 F.3d 1247 (11th Cir. 2011) ................................................................. 17

*United States v. Smith,*
    230 F.3d 300 (7th Cir. 2000) ..................................................................... 17

*United States v. Spinney,*
    795 F.2d 1410 (9th Cir.1986) .................................................................... 15

*United States v. Threadgill,*
    172 F.3d 357 (5th Cir. 1999) ..................................................................... 16

*United States v. Villegas,*
    784 F. Supp. 6, 14 (E.D.N.Y. 1991) ......................................................... 16

*United States v. W.R. Grace,*
    455 F. Supp. 2d 1172 (D. Mont. 2006) ..................................................... 12

## STATUTES

29 U.S.C. § 651 ............................................................................................. 7

29 U.S.C. §§ 657-666 ................................................................................... 7

29 U.S.C. § 666(e) ...................................................................................... 10

42 U.S.C. § 7401(b)(1) ................................................................ 6

42 U.S.C. § 7411(a)(4) ............................................................... 4

42 U.S.C. § 7412(r)(7) ............................................................ 7, 8

42 U.S.C. § 7413(c) ......................................................... 9, 10, 15

## REGULATIONS

29 C.F.R. § 1910.1000 ............................................................... 9

40 C.F.R. § 50.1(e) ................................................................. 1

40 C.F.R. § 68.3 ..................................................................... 8

36 Fed. Reg. 22,384 (Nov. 25, 1971) ................................................ 2

## OTHER AUTHORITIES

136 Cong. Rec. S16895-01 (Oct. 27, 1990) ...................................... 6, 11

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation Of Legal Texts*
(2012) ........................................................................... 3

Deborah L. Harris, *Achieving Worker Safety Through Environmental Crimes
Prosecutions,* 59 US. Att'ys Bull. 58, 60 (2011) ................................. 13

*EPA's Ambient Air Policy Results in Additional Pollution*, B-220184
(July 26, 1989) ............................................................... 5, 6

Fed. R. Crim. P. 7(c)(1) ......................................................... 16

*General Guidance on Risk Management Programs for Chemical Accident Prevention*,
EPA 555-B-04-001 (March 2009) .............................................. 7, 8, 15

Jury Instructions, *United States v. Rimmasch*,
No. 0:21-cr-000138 (D. Wyo. April 13, 2022), ECF 141 ............................ 13

Plea Agreement, *United States v. Chemical and Metals Inc.*,
No. 3:08-cr-00028 (M.D. La. Jan. 13, 2010) ..................................... 14

Public Law 101-549, 104 STAT. 2399-2712 (Nov. 15, 1990) ...................... 6, 8, 9

Settlement Agreement, *Hugler v. E.I. Du Pont de Nemours & Co., Inc.*,
No. 15-1036 (OSHRC May 5, 2017) ................................................ 11

iv

Statement of Facts, *United States v. Motiva Corp.*,
    No. 1:05-cr-000021 (D. Del. Mar. 16, 2005), ECF 4 .................................................. 14

*Training Requirements in OSHA Standards*, OSHA 2254-09R 2015 ............................. 10

Wayne LaFave, 1 Substantive Criminal Law § 6.4 (3d ed. 2021) .................................... 16

# INTRODUCTION

The issue before the court with respect to Count Three is simple: whether the government can disregard EPA's regulatory definition of "ambient air" (a term of art in the Clean Air Act that was promulgated over 50 years ago through notice and comment rulemaking) for a new definition that is inconsistent with the regulatory history of the term and conflicts with the plain intent of Congress in enacting the relevant statutes.

Nothing in the government's response rebuts DuPont's showing, consistent with multiple statutory interpretation canons, that Congress intended for the regulatory definition to apply to the 1990 Clean Air Act ("CAA") Amendments, including the additions of a new Section 112(r) governing accidental releases of chemicals and a new crime of negligent endangerment as part of Section 113. EPA's longstanding definition of "ambient air" is "that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. § 50.1(e). Application of this definition to the prosecution of negligent releases into the outside air that is publicly accessible is entirely consistent with the purpose of the CAA to protect public health and welfare. In contrast, for releases in a private building or property closed to the public that had the potential to harm workers, Congress provided for enforcement under the Occupational Safety and Health Act ("OSH Act"). The text of the 1990 CAA Amendments directed EPA to address the potential for harm to the public from accidental chemical releases while OSHA was directed to address the potential for harm to workers. This congressionally mandated division of authority granted to EPA and OSHA under the CAA and the OSH Act, respectively, is key context to understanding the proper scope of the negligent endangerment charge in Count Three.

Finally, EPA itself has repeatedly rejected efforts to rewrite or revise the regulatory definition upon which Defendants rely. The government cannot now redefine "ambient air" in a criminal enforcement case. It has alleged no facts within the four corners of the Indictment that, if proven at trial, would constitute the offense of negligent endangerment. Thus, as this is not a case about releases to the "ambient air," Count Three must be dismissed.

ARGUMENT

## I. Congress Intended That The Regulatory Definition Of Ambient Air Apply To Negligent Endangerment Crimes

Three cardinal principles of statutory interpretation – term of art, consistent usage, and prior construction – all reinforce that the regulatory definition of "ambient air" applies to the CAA's negligent endangerment provision. *See e.g., United States v. Bittner*, 19 F.4th 734, 740-41 (5th Cir. 2021). The CAA is a comprehensive and complex statute that relies on a variety of scientific concepts to improve air quality for the public. *See e.g., Appalachian Power Co. v. EPA*, 135 F.3d 791, 801-02 (D.C. Cir. 1998) (recognizing that the CAA is "unwieldly and science driven"). "Ambient air" is a term of art in the CAA that EPA defined through notice and comment rulemaking in 1971. *See* 36 Fed. Reg. 22,384 (Nov. 25, 1971). As such, the term must be interpreted according to its regulatory definition. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) ("In the absence of contrary indication, we assume that when a statute uses such a term [of art], Congress intended it to have its established meaning."); *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each

2

borrowed word in the body of learning from which it was taken.") (internal quotations and citations omitted). In particular, "[o]rdinary meaning is of limited utility . . . when determining the proper interpretation of a scientific term employed by Congress in the context of a complex statutory regime, laden with scientific language and other terms of art." *Teva Pharms. USA, Inc. v. United States Food & Drug Admin.*, 514 F. Supp. 3d 66, 99 (D.D.C. 2020) (quotations and citations omitted).

The consistent usage and prior construction canons further support applying EPA's regulatory definition of ambient air. "Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations." *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) (citations omitted). As the Supreme Court has explained:

> the uniformity of the administrative and judicial precedent construing the definition [is] significant. When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.

*Id.* at 645 (citing *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978)); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation Of Legal Texts* 322 (2012) ("The clearest application of the prior-construction canon occurs with reenactments: If a word or phrase has been authoritatively interpreted by. . . the responsible agency, a later version of that act perpetuating the wording is presumed to carry forward that interpretation.").

The government has not identified *any* statutory language or legislative history from the 1990 CAA Amendments that would rebut the use of these accepted canons of statutory

interpretation with respect to ambient air. In an attempt to support its assertion that Congress, improbably and *sub silentio*, rejected the well-established regulatory definition of ambient air in favor of one now "promulgated" in an enforcement case in 2022, the government cites to *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007). Gov't's Consolidated Motion to Reconsider Dismissal of Count One and Response to DuPont's Motions to Dismiss Counts Two and Three at 86-87, (hereinafter "ECF 52"). But the statutory and regulatory structure and history at issue in *Duke Energy* are distinguishable from what is before this court, rendering it inapplicable.

In *Duke Energy,* the Supreme Court focused on the definition of "modification" under the Prevention of Significant Deterioration ("PSD") provisions of the Clean Air Act in the context of a civil enforcement action related to coal-fired power plant modifications.[1] Prior to the 1977 CAA Amendments that statutorily authorized the PSD provisions, Congress had defined that term in relation to the New Source Performance Standards ("NSPS") created by the 1970 CAA, *see* 42 U.S.C. § 7411(a)(4). *Id.* at 565-66. EPA had also promulgated separate regulations before the 1977 CAA Amendments further expanding on the statutory definition of "modification" in the specific contexts of the NSPS program and a precursor to the PSD program. *Id.* at 567-68 n.1-2. Given the existence of multiple regulatory definitions of the term "modification" when Congress authorized the 1977 Amendments, which were not altogether consistent with each other, and nothing in the legislative history to inform which definition Congress intended to apply to the PSD

---

[1] Because *Duke Energy* concerned statutory interpretation in the context of a civil enforcement action, arguments related to due process, fair notice and the rule of lenity were not before the court. Nor did the parties address the "term of art" canon of statutory interpretation in briefing.

provisions, the *Duke Energy* court declined to apply the prior construction and consistent usage canons set forth in *Bragdon*. *Id.* at 576, 578 n.6.

The text and legislative history of the 1990 CAA Amendments tell a very different story regarding what Congress intended "ambient air" to mean in the context of a negligent endangerment crime. Congress did not define "ambient air" in the original 1970 CAA, a complex, scientific statute (nor in any subsequent statutory amendment), and the only regulatory definition in place at the time of the 1990 Amendments was EPA's 1971 definition. Indeed, the fact that EPA thought a regulatory definition was needed in the first place is in and of itself a tacit admission that the term does not have a plain meaning. Since that time, the definition of "ambient air" has been the subject of both Congressional and EPA scrutiny, in particular during the months leading up to the 1990 CAA Amendments.

The July 1989 GAO report on ambient air (*EPA's Ambient Air Policy Results in Additional Pollution*, B-220184, Released July 26, 1989),[2] cited in the government's response at pages 87-88, was commissioned by the House Energy and Commerce Committee. Representative John Dingell, as Committee Chairman, received the GAO report a month after President George H.W. Bush first proposed CAA Amendments to Congress in June 1989. *See* the cover letter to the GAO report. This report details EPA's interpretation of its own regulatory definition of "ambient air" from the definition's inception in 1971 through report date in 1989. The report notes that that EPA had previously considered and rejected expanding the definition of "ambient air" to all "air."

---

[2] *See* https://www.gao.gov/assets/rced-89-144.pdf.

GAO Report at 14-15. This position mirrors the decision of Congress, which declined to substitute "air" for "ambient air" when it rejected the Senate version of endangerment crimes in conference. *Compare* GAO Report at 15 to 136 Cong. Rec. S16895-01, S16952 (1990). Given the GAO report, Rep. Dingell and the rest of the Energy and Commerce Committee were well aware of EPA's regulatory definition when co-drafting the House version of the bill (particularly given that the 1990 CAA Amendments also extensively amended the National Ambient Air Quality Standards ("NAAQS") requirements in Title I), and the import of adopting the House version of the endangerment crimes criminalizing releases into the "ambient air" as reflected in the conference report.[3] *Id.*

Moreover, the structure of the 1990 Amendments and the overall purpose of the CAA illuminates Congressional intent with respect to "ambient air"—all of which the government ignores. The government's brief fails to recognize that Congress created two separate, but complimentary, roles when it delegated authority to EPA and OSHA in the 1990 CAA Amendments to address different aspects of chemical releases. The overriding purpose of the CAA is to protect *public health and welfare* through protection of the Nation's air resources.[4] The focus of the OSH Act is on achieving "safe and healthful

---

[3] *See e.g.*, U.S. House of Representatives, Historical Highlights, The Clean Air Act Amendments of 1990, (Oct. 22, 1990), https://history.house.gov/Historical-Highlights/1951-2000/1990_10_22_Clean_air/; Stephen E. Roady, *Permitting and Enforcement Under the Clean Air Act Amendments of 1990*, 21 Envtl. L. Rep. News & Analysis 10178, 10181-82 (Envtl. L. Inst.) (1991).

[4] In Section 101, Congress declared that the CAA is the Nation's comprehensive air pollution control statute, and includes provisions designed "to protect and enhance the quality of the Nation's air resources so as to promote the *public health and welfare* and the productive capacity of its population." 42 U.S.C. § 7401(b)(1) (emphasis added). Congress referenced this objective repeatedly throughout the 1990 CAA Amendments and its legislative history. *See generally* Public Law 101-549, 104 STAT. 2399-2712 (Nov. 15, 1990); 136 Cong. Rec. S16895-01 (Oct. 27, 1990).

working conditions" for *employees*.[5]  In the 1990 Amendments, Congress intentionally limited the scope of Section 112(r) and the related Section 113 endangerment crimes to reflect the purpose of the CAA to protect the public health and welfare in light of the fact that it separately directed OSHA to promulgate regulations focused on worker safety that would be enforceable under the OSH Act.[6]

Congress amended Section 112 to introduce a new Section 112(r) focused on "the prevention and detection of accidental releases" of hazardous substances, but specifically limited the scope of EPA's authority in Section 112(r)(7)(G) by directing it <u>not</u> "to prescribe or enforce standards or regulations affecting occupational safety and health."[7]  42

---

[5]  The United States Department of Labor ("DOL"), a department and agency of the executive branch of the United States Government, is responsible for the enforcement of the laws of the United States in the area of labor and employment conditions, including the OSH Act, 29 U.S.C. § 651 et seq.  One purpose of the OSH Act is to "achiev[e] safe and healthful working conditions" for employees.  29 U.S.C. § 651(b)(2).  The Occupational Safety and Health Administration ("OSHA"), an agency of the DOL, is responsible for administering the OSH Act through the promulgation and enforcement of safety and health regulations covering federal and private sector workers throughout the United States.  OSHA is empowered to conduct investigations into violations of worker safety standards, and issue citations and both civil and criminal penalties for those violations.  *See* 29 U.S.C. §§ 657-666.

[6]  EPA recognized this fundamental difference in legal authority in its own guidance document on risk management plan regulations, which the government cited for a different purpose in its reconsideration motion.  *See* ECF 52 at 29 note 10.  "EPA and OSHA have different legal authority — EPA for offsite consequences, OSHA for on-site consequences." EPA Office of Solid Waste and Emergency Response, *General Guidance on Risk Management Programs for Chemical Accident Prevention*, EPA 555-B-04-001, Ch. 7 at 7-1 (March 2009), https://www.epa.gov/sites/default/files/2013-11/documents/chap-07-final.pdf.

[7]  EPA's own public guidance states that the "goal of part 68 and the risk management program it requires is to prevent accidental releases of substances that can cause *serious harm to the public and the environment* from short-term exposures and to mitigate the severity of releases that do occur."  EPA Office of Solid Waste and Emergency Response, *General Guidance on Risk Management Programs for Chemical Accident Prevention*, EPA 555-B-04-001, Introduction at i (March 2009), https://www.epa.gov/sites/default/files/2013-10/documents/chap-01-final.pdf (emphasis added).  Further, EPA acknowledged the limitation of its regulatory authority when stating it

U.S.C. § 7412(r)(7)(G). Instead, Congress gave EPA authority "to prevent accidental releases of regulated substances" by issuing "release prevention, detection and correction requirements" pursuant to Section 301 of the 1990 Amendments, *see* Section 112(r)(7)(A), all for the purpose of regulating releases to the "ambient air." Given the separation of roles, Congress required EPA to "consult with the Secretary of Labor . . . and . . . coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration." *Id.* at § 7412(r)(7)(D). Congress also specifically defined "accidental releases" in Section 112(r)(2)(A) as "an unanticipated emission of a regulated substance or other extremely hazardous substance into the *ambient air* from a stationary source," which underscores the protection of the public.[8] 104 STAT. at 2563-64 (Nov. 15, 1990) (emphasis added).

The relevant criminal enforcement provisions, created by the 1990 Amendments, are inextricably tied to the limits of EPA's authority under Section 112. In the 1990 Amendments, Congress, for the first time, made it a crime to negligently or knowingly release "any hazardous air pollutant listed pursuant to section 7412 of this title" into the

---

had to change [its own RMP regulations] to reflect the differences between its authority and OSHA's. For example, OSHA regulates to protect workers; EPA's responsibility is to protect public health and safety and the environment. Therefore, an 'owner or operator' subject to EPA's rule must investigate any catastrophic release 'that presents imminent and substantial endangerment to public health and the environment,' but an OSHA 'employer' would focus its concerns on the workplace.

*Id.* at Ch. 7 at 7-1.

[8] In 1994, EPA adopted the statutory definition of "accidental release" exactly as written by Congress when it first promulgated definitions applicable to its chemical accident prevention regulations set forth in 40 C.F.R. Part 68 and has not changed the definition of "ambient air" with respect to "accidental release" as part of those regulations in the six times it has since amended the definitions provision. *See* 40 C.F.R. § 68.3.

"ambient air." 42 U.S.C. §§ 7413(c)(4), 7413(c)(5). Thus, the law limits EPA's authority to bring criminal enforcement actions in connection with releases regulated by Section 112 that could harm the public (aka those in "ambient air") in Section 113(c)(4) and (5).

In contrast, Congress gave OSHA the complimentary authority "to prevent accidental releases of chemicals which could *pose a threat to employees*" by issuing chemical process safety management regulations pursuant to Section 304 of the 1990 Amendments. 104 STAT. at 2576 (emphasis added). Congress also directed OSHA to "promulgate, pursuant to the Occupational Safety and Health Act, a chemical process safety standard *designed to protect employees* from hazards associated with accidental releases of highly hazardous chemicals in the workplace." *Id.* (emphasis added). Significantly, Congress did not define "accidental release" in relation to ambient air under the 1990 Amendments when delegating rulemaking authority to OSHA under the OSH Act, indicating that it intended for OSHA, not EPA, to regulate worker safety from releases into the air (as distinct from releases into ambient air under the CAA).

Under the authority provided by Congress in the OSH Act, OSHA has set different exposure limits for workers. For example, the workplace permissible exposure limit for methyl mercaptan ("MeSH") (the chemical accidentally released during the La Porte incident) is 10 ppm, which is more protective than the EPRG-2, EPRG-3 and IDLH limits that the government references in its response at pages 81-83 because workers may interact with various chemicals as part of their regular job responsibilities. *See* 29 C.F.R. § 1910.1000. Workers, unlike the public, also have specialized training and knowledge of the risks of their workplace and the ability to better protect themselves from those risks.

*See e.g.,* OSHA, *Training Requirements in OSHA Standards*, OSHA 2254-09R 2015.[9]

Thus, Congress set a different standard for criminal prosecution of worker safety violations under the OSH Act, providing for criminal prosecution of willful violations of OSHA regulations resulting in a fatality, including the regulations promulgated by OSHA to prevent accidental releases of chemicals pursuant to Section 304 of the 1990 Amendments. *See* 29 U.S.C. § 666(e).

## II. Applying The Regulatory Definition Of Ambient Air Does Not Lead To Absurd Results Or Render The Affirmative Defense To Knowing Endangerment Inapplicable

Limiting endangerment crimes to those involving releases into publicly accessible outside air is consistent with Congress' expressed intent for the CAA to protect public health and the OSH Act to protect workers, as discussed above. The government's argument that it will render ineffective the CAA's affirmative defense to knowing endangerment, a crime not charged here, is incorrect.[10] ECF 52 at 93-94. Applying the regulatory definition of ambient air does not render that affirmative defense meaningless, as it would still apply to those workers who are outside of buildings in publicly accessible areas (*e.g.,* public parking lots, roadways, etc.). The fallacy in the government's argument (which was also a key basis for the wrongly decided *United States v. O'Connell* decision)

---

[9]    *See* https://www.osha.gov/sites/default/files/publications/osha2254.pdf (last accessed June 19, 2022).

[10]    CAA Section 113(c)(5)(C) states that "[i]t is an affirmative defense to a prosecution [for knowing endangerment] that the conduct charged was freely consented to by the person endangered and that the danger and conduct charged were reasonably foreseeable hazards of—(i) an occupation, a business, or a profession; or (ii) medical treatment or medical or scientific experimentation conducted by professionally approved methods and such other person had been made aware of the risks involved prior to giving consent." 42 U.S.C. § 7413(c)(5)(C).

is that it is premised on an *ad hoc* attempt to expand the CAA, a statute focused on the protection of public health, beyond its statutory authority and usurp the OSH Act, the statute Congress created to protect workers.[11]  As discussed above, the OSH Act has its own criminal enforcement provisions, and has not been charged in this matter.[12]  *Cf. United States v. Borowski*, 977 F.2d 27, 30 (1st Cir. 1992) (vacating convictions because Clean Water Act ("CWA") knowing endangerment crimes cannot be premised on harm to facility employees if the purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and not to "provide protection to industrial employees who work with hazardous substances").[13]

## III.    The Government's Attempts To Distinguish *Ho* And Similar Cases Are Unavailing

In an effort to overcome *United States v. Ho*, No. H-00-183, ECF 92 and 94 (S.D. Tex. Nov. 17, 2000), the government misreads the holding in the civil case, *Duke Energy*.

---

[11]    *See* the magistrate judge's opinion in *United States v. O'Connell*, Case No. 17-CR-50, 2017, 2017 WL 9360868 at *7-8 (E.D. Wis. Sept. 5, 2017) and the district court's opinion affirming the magistrate judge at *United States v. O'Connell*, Case No. 17-CR-50, 2017 WL 4675775 at *1 (E.D. Wis. Oct. 17, 2017) (both asserting that one purpose of the CAA is to protect workers).  The underlying briefs regarding the motion to dismiss that was at issue in *O'Connell* reveal that there was no discussion of the structure and text of the 1990 Amendments indicating that Congress expressly directed EPA to protect the public and OSHA to protect workers in relation to releases of hazardous substances.  Nor was "term of art" canon of statutory interpretation briefed or considered by the court in relation to ambient air.  *See O'Connell,* ECF 56, 78, 90, 99, 100 and 102.

[12]    In addition, DuPont resolved its potential civil liability under the OSH Act with the government through a settlement agreement with OSHA executed in May 2017.  *See* Settlement Agreement, *Hugler v. E.I. Du Pont de Nemours & Co., Inc.*, No. 15-1036 (OSHRC May 5, 2017).

[13]    As the government has acknowledged in its response at 93, the knowing endangerment crime was added to the CAA at the same time as the negligent endangerment crime and has a parallel structure. When adding the endangerment crimes, Congress modeled the CAA knowing endangerment crime in part on the CWA knowing endangerment crime and intended them to operate similarly.  *See* 136 Cong. Rec. at S16951.

Under *Duke Energy*, there is still a <u>rebuttable</u> presumption that identical terms should be read consistently within a statute. The government has provided no support for the court to re-define a scientific term of art like "ambient air" differently from its well-established regulatory definition in the context of a criminal enforcement case. While the government points to the original 1970 CAA legislative history of the NAAQS at page 87 of its response, it offers no support in the text or the legislative history of the <u>1990 Amendments</u> to support its argument that Congress intended "ambient air" to mean something entirely different than the regulatory definition.

The best evidence of Congressional intent is found in the text of related CAA statutory provisions and the legislative history from the 1990 Amendments. This record dictates the opposite outcome and supports Judge Werlein's opinion in *Ho* (and *United States v. W.R. Grace*, 455 F. Supp. 2d 1172, 1174-75 (D. Mont. 2006) following it) that the regulatory definition of ambient air applies to endangerment crimes. Even the judge in *Margiotta* recognized that it could be reversible error if he accepted the government's proposed definition of ambient air as "that portion of the atmosphere not completely enclosed in a building or structure" when instructing the jury on the negligent endangerment charge as it was contrary to the regulatory definition. Transcript of Trial With a Jury at 864-65, *United States v. Margiotta*, No. 1:17-cr-00143 (D. Mont. Sept. 27, 2019), ECF 121; Withdrawn Jury Instructions at 28, (D. Mont. Sept. 30, 2019), ECF 126. The government in that case agreed to withdraw its proposed definition. *Id.*

## IV. To The Extent The Term "Ambient Air" Is Ambiguous, DuPont's Due Process Right To Fair Notice And The Rule Of Lenity Dictate Application Of The Regulatory Definition

To the extent that the government's efforts to redefine "ambient air" in a criminal prosecution creates any ambiguity as to the applicable meaning, as DuPont pointed out in its opening brief, Motion to Dismiss Count Three at 17-18 (hereinafter "ECF 50"), the rule of lenity requires it be construed in DuPont's favor, which happens to be consistent with the government's own long-standing definition of the term and every published court decision interpreting that term prior to the November 2014 incident.[14]  Indeed, DOJ's Environmental Crimes Section has itself recognized that the scope of the CAA's endangerment crimes "appears to be" limited by the regulatory definition of "ambient air." *See* Deborah L. Harris, *Achieving Worker Safety Through Environmental Crimes Prosecutions*, 59 US. Att'ys Bull. 58, 60 (2011).  Thus, the term "ambient air" is at best ambiguous, and as this court has previously recognized in this case, the rule of lenity dictates that the ambiguity be resolved in the defendant's favor.  ECF 44 at 17 (hereinafter "Opinion").

Moreover, as previously noted, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *See* ECF 50 at 16 (citing United States v. Lanier, 520 U.S. 259, 266 (1997)).  In response, the government suggests that plea

---

[14]   As noted previously, neither the 2017 unpublished *O'Connell* decision nor the newly cited April 2022 jury instructions in *United States v. Rimmasch*, No. 0:21-cr-000138 (D. Wyo. April 13, 2022), ECF 141, *see* ECF 52 at 89, provide fair notice to DuPont or its employees of the definition of ambient air the government is seeking to apply here as both were issued years after the November 2014 accident.

agreements suffice as fair notice that the government had redefined a regulatory term of art. *See* ECF 52 at 94-95 n.23. As this court has previously recognized, negotiated agreements do not "amount to an 'interpretation' in the same way as an agency's legislative rule." Opinion at 16. Plea agreements (entered into both before and after the November 2014 incident) do not form a basis to revise the regulatory definition of "ambient air," and cannot be considered Constitutionally sufficient fair notice to DuPont and its employees, including Ken Sandel, that a release of hazardous substances inside a building within the secured fence line of the La Porte facility on November 15, 2014 could be prosecuted as a release to the "ambient air."[15]

## V.    The Indictment Fails to Allege An Offense Because It Does Not Contain Any Facts Indicating That The Negligent Release Caused Imminent Danger

In an effort to save its fatally flawed Indictment, the government next tries to argue that its allegation of a release into the "ambient air" need not have caused any imminent danger, if danger from the release occurred elsewhere. This attempt to separate a criminal provision's elements is without legal support and defies common sense.

For a negligent release into the ambient air to be prosecuted as a crime, the release into the ambient air must be alleged to have caused an imminent danger. This, however,

---

[15]    None of the supporting plea documents cited allege any facts as to whether the releases occurred in publicly accessible areas of the facilities at issue. Indeed, some of the supporting plea documents do not even allege releases into the ambient air. *See* Statement of Facts at ¶ 10, *United States v. Motiva Corp.,* No. 1:05-cr-000021 (D. Del. Mar. 16, 2005), ECF 4 ("As a result of Tank 393's history of significant corrosion and improper conversion, there was a release of spent sulfuric acid vapors, an extremely hazardous substance, into the environment."); Plea Agreement at 3, *United States v. Chemical and Metals Inc.*, No. 3:08-cr-00028 (M.D. La. Jan. 13, 2010), ECF 32 ("On July 29, 2003, Delvin Henry, an employee at Honeywell's Baton Rouge facility, died after being exposed to various hazardous materials, including antimony compounds and hydrogen fluoride, that emitted into the air from a one-ton cylinder labeled as containing refrigerant gas.").

is not what the Indictment alleges.  The persons the government alleges were in imminent danger from the release were inside the manufacturing building.  The Indictment does not allege that anyone in the "ambient air" was placed in imminent danger.  Under the government's interpretation, in which the imminent danger does not need to have any relationship to the negligent release, the statute's limiting language, emphasized below, would be made meaningless:

> A person [1] "who negligently releases into the ambient air . . . any extremely hazardous substance" and
>
> [2] "*who at the time* negligently places another person in imminent danger" would be criminally liable under the CAA.

42 U.S.C. § 7413(c)(4) (emphasis added).  The government's effort to bifurcate the law, separating the "release" from the "endangerment" is facially in conflict with the purpose of CAA to protect public health and welfare.  *See supra* Section I.  By using the words "who at the time," Congress required that a person be in imminent danger at the time of the negligent release into "ambient air."  EPA's own March 2009 guidance document reinforces this point by stating that EPA's legal authority is limited to "offsite consequences" of chemical releases.[16]  In essence, the negligent release must cause the imminent danger and both must occur in the ambient air.[17]

---

[16] EPA Office of Solid Waste and Emergency Response, *General Guidance on Risk Management Programs for Chemical Accident Prevention*, EPA 555-B-04-001, Ch. 7 at 7-1 (March 2009), https://www.epa.gov/sites/default/files/2013-11/documents/chap-07-final.pdf.

[17] *See United States v. Pineda-Doval*, 614 F.3d 1019, 1026 (9th Cir. 2010) ("A "basic tenet of criminal law" is that, when a criminal statute requires that the defendant's conduct has resulted in an injury, "the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury.") (citations omitted); *United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir.1986) ("A basic tenet of criminal law is that the government must prove that the

## VI.     Facts Alleged Outside The Indictment Cannot Cure Fair Notice Deficiencies

Finally, the government argues that even if the regulatory definition of ambient air applies, the Indictment is sufficient, because it contains the bare words in the statute.  ECF 52 at 77-83.  Beyond simply reciting the statute, however, the federal rules require an indictment to state "the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  While an indictment need not detail all the evidence that the prosecution will use to prove the elements at trial, the essential facts as to all required elements must still be "described with particularity."  *United States v. Cooper*, 714 F.3d 873, 877 (5th Cir. 2013) (quoting *United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir. 1999)); *United States v. Resendiz–Ponce*, 549 U.S. 107, 109 (2007) ("[W]hile an indictment parroting the language of a federal criminal statute is often sufficient, there are crimes that must be charged with greater specificity.").

This factual particularity requirement ensures that a defendant has adequate notice of the essential nature of the charges he must now defend.  "[A]n indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough

---

defendant's conduct was the legal or proximate cause of the resulting injury."); Wayne LaFave, 1 Substantive Criminal Law § 6.4 (3d ed. 2021) ("With crimes so defined as to require not merely conduct but also a specified result of conduct, the defendant's conduct must be the "legal" or "proximate" cause of the result."); *United States v. Villegas*, 784 F. Supp. 6, 14 (E.D.N.Y. 1991) (granting motion for judgment of acquittal on CWA knowing endangerment for failure to establish knowledge of imminent danger, and defining "imminent danger" to mean "danger that is a highly probable consequence of a discharge.") *aff'd in relevant part*, *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 650 (2d Cir. 1993); *United States v. Little*, 308 F. App'x 256, 259-60 (10th Cir. 2009) (affirming conviction for CAA negligent endangerment, holding that evidence was sufficient to establish "imminent danger" of death or serious bodily injury, because exposure to asbestos was an "immediate result" of defendant's conduct, and the exposure "created a combination of conditions which could reasonably be expected, absent a remedy, to cause the inmates to experience serious bodily injury or death"); *United States v. Hylton*, 308 F. App'x 262, 264 (10th Cir. 2009) (same).

factual particulars to 'sufficiently apprise the defendant of what he must be prepared to meet.'" *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) (quoting *Russell v. United States*, 369 U.S. 749, 763 (1962)); *accord United States v. Schmitz*, 634 F.3d 1247, 1261 (11th Cir. 2011). Moreover, facts alleged outside the indictment cannot cure fair notice deficiencies embedded in the charging instrument. *See United States v. Gonzales*, 121 F.3d 928, 941 (5th Cir. 1997) ("An indictment provides fair notice if it states the specific facts and circumstances surrounding the offense in sufficient detail to inform a defendant of the charges. *See Hamling [v. United States]*, 418 U.S. [87,] 117-18 [(1974)]; *[United States v.] Nevers*, 7 F.3d [59,] 63 [(5th Cir. 1993)].")

While the government has parroted the statutory language of negligent endangerment, it has failed to allege any facts that would support that crime given the regulatory definition of "ambient air" discussed above. Tellingly, the government tries to remedy this fatal flaw by spending seven pages of its twenty-page response to the Motion to Dismiss Count Three discussing facts that were not alleged in the Indictment, including a thirty-page recently created report attached as Exhibit C to its response. Put another way, there is nothing on the face of the Indictment that apprises DuPont and Ken Sandel that they should be prepared to defend themselves against allegations that people outside the fence line of the facility were in imminent danger. In fact, the Indictment only references imminent harm to those employees *within* the manufacturing building inside the fence line of the facility. These deficiencies in the Indictment cannot be overcome from a constitutional fair notice perspective.

## CONCLUSION

Based on the foregoing, DuPont respectfully requests that the Court dismiss Count

Three of the Indictment for failure to allege an offense.

Date:  June 22, 2022

Respectfully submitted,

/s/ *Lily N. Chinn*
Lily N. Chinn
lily.chinn@bakerbotts.com
**BAKER BOTTS LLP**
101 California Street Suite 3200
San Francisco, California 94111
415.291.6214 (Tel) | 415.291.6314 (Fax)

Nadira Clarke
nadira.clarke@bakerbotts.com
Steve Solow
steve.solow@bakerbotts.com
**BAKER BOTTS LLP**
700 K Street, N.W.
Washington, D.C.  20001
202.639.7700 (Tel) | 202.639.7890 (Fax)

David Gerger
dgerger@ghmfirm.com
Ashlee McFarlane
amcfarlane@ghmfirm.com
**GERGER HENNESSY & MCFARLANE, LLP**
1001 Fannin St. Suite 2450
Houston, Texas 77002
713.224.4400 (Tel) | 713.224.5153 (Fax)

**ATTORNEYS FOR DEFENDANT E.I. DU PONT DE NEMOURS AND CO.**

## CERTIFICATE OF SERVICE

I have filed this pleading with the Clerk of Court using the CM/ECF system, which will serve a copy on counsel of record.

/s/ *Lily N. Chinn*
Lily N. Chinn