United States District Court
Southern District of Texas
**ENTERED**

August 18, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CRIMINAL NO. H-21-16 |
| | § | |
| V. | § | |
| | § | |
| | § | |
| E.I. DU PONT DE NEMOURS AND CO. | § | |
| AND KENNETH J. SANDEL, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Four DuPont workers died when they were exposed to hazardous gas at the DuPont plant in LaPorte, Texas in November 2014.  On January 7, 2021, the grand jury returned a three-count indictment against DuPont and Kenneth Sandel, the Unit Operations Leader of the Insecticide Business Unit where the gas release took place.  Counts One and Two alleged knowing violations of the safety regulations designed to prevent accidental releases of toxic substances into the atmosphere.  Count Three alleged the negligent release of an extremely hazardous substance.  As a result of tolling agreements, limitations reach back to November 7, 2014.

The court previously dismissed Count One on the ground that the government had failed to allege a violation of 40 C.F.R § 68.69(d).  The court concluded that the failure to follow a safety procedure was different from the failure to implement the procedure, and the indictment alleged only failures to follow specific safety procedures designed to prevent toxic gas releases during line breaks.  The government filed a motion to reconsider the dismissal of Count One, this time providing Fifth Circuit authority supporting the government's contention that the allegations of failures to follow the procedure for line breaks sufficiently alleged a failure to implement that

policy, making dismissal of the indictment improper.  DuPont responded, and now also moves to dismiss Counts Two and Three of the indictment.

The court held argument on the motions.  Based on the thorough briefs and arguments from all parties and the applicable law, the court grants the government's motion for reconsideration of the dismissal of Count One and denies the defendants' motions to dismiss Counts Two and Three. The reasons are stated below.

## I.    Background

### A.    The Indictment

The Clean Air Act imposes criminal penalties against: "[a]ny person who knowingly violates any requirement or prohibition of . . . section 7412 of this title . . . including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections[.]"  42 U.S.C. § 7413(c)(1).   Section 7412(r)(7) requires the Environmental Protection Agency to publish regulations aimed at preventing and mitigating accidental releases of hazardous substances.  42 U.S.C. § 7412(r)(7).  The EPA issued a set of regulations known as the Risk Management Program. 40 C.F.R. Part 68.  One Risk Management Program requirement, titled Operating Procedures, provides that:

> The owner or operator shall **develop and implement safe work practices to provide for the control of hazards during operations** such as lockout/tagout; confined space entry; opening process equipment or piping; and control over entrance into a stationary source by maintenance, contractor, laboratory, or other support personnel. These safe work practices shall apply to employees and contractor employees.

40 C.F.R. § 68.69(d) (emphasis added).  Another, titled Management of Change, provides:

> (a) The owner or operator shall **establish and implement written procedures to manage changes** (except for "replacements in kind") to process chemicals, technology, equipment, and procedures; and, changes to stationary sources that affect a covered process.

(b) The procedures shall assure that the following considerations are addressed prior to any change:

> (1) The technical basis for the proposed change;

> (2) Impact of change on safety and health;

> (3) Modifications to operating procedures;

> (4) Necessary time period for the change; and,

> (5) Authorization requirements for the proposed change.

(c) Employees involved in operating a process and maintenance and contract employees whose job tasks will be affected by a change in the process shall be informed of, and trained in, the change prior to start-up of the process or affected part of the process.

(d) If a change covered by this paragraph results in a change in the process safety information required by § 68.65 of this part, such information shall be updated accordingly.

(e) If a change covered by this paragraph results in a change in the operating procedures or practices required by § 68.69, such procedures or practices shall be updated accordingly.

§ 68.75 (emphasis added).

Count One alleges that DuPont violated 42 U.S.C. § 7412(r)(7) by knowingly violating § 68.69(d)'s requirement to "implement safe work practices to provide for the control of hazards during operations" at its Insecticide Business Unit in LaPorte, Texas. (Docket Entry No. 1-1 at 7). Count Two alleges that DuPont knowingly violated 42 U.S.C. § 7412(r)(7) by knowingly violating § 68.75 by "failing to implement written procedures to manage changes." (Docket Entry No. 1-1 at 12). Count Three alleges that DuPont "negligently released and caused the release into the ambient air of an extremely hazardous substance listed pursuant to Title 42, United States Code, Section 11002(a)(2), that is, methyl mercaptan, and at the time negligently placed another person in imminent danger of death and serious bodily injury." (Docket Entry No. 1-1 at 17).

**B.     Factual Background**

Methyl Mercaptan (MeSH) is a toxic, colorless gas with a pungent odor.  It is used in large quantities as a raw material in industrial products such as pesticides.  The EPA classified MeSH as an extremely hazardous substance under 42 U.S.C. § 11002 because of its ability to cause serious health effects.  The indictment alleges that a high concentration of MeSH will result in asphyxiation.

Count One alleges that DuPont violated § 68.69(d), "[b]eginning on or about July 2011 and continuing to November 15, 2014," by failing to implement safe work practices to provide for the control of hazards during operations.  (Docket Entry No. 1 at 7).  The hazard involved the draining of a MeSH Vent Header in the Insecticide Business Unit of the LaPorte plant.  A line break is when "hazardous processes and systems" are opened to the atmosphere.  The indictment alleges that the MeSH Vent Header was a "hazardous system" as defined by DuPont's corporate standards, because the Vent Header was a line "that could contain material that is hazardous on contact or inhalation."  As required under § 68.69(d), DuPont established company-wide safety practices for line breaks.  These practices were published in a document titled the "SHE Standard S27G Line Breaks."  DuPont also developed the LaPorte Line Break Procedure, which described the safety protocols for line breaks at the LaPorte plant.  This Procedure required a qualified employee to prepare a written job plan before opening any hazardous system.  The plan would identify the hazards created by the line break and explain how to control them.  The plan had to describe the required personal protective equipment and provide contingency plans for problems that arose.  The Line Break Procedure required a supervisor and other DuPont employees to sign off on the plan and grant a line break permit.  (Docket Entry No. 1 at 4–5).

The indictment alleges that in 2011, DuPont installed a new incinerator for waste gas, the NOx Reducing Scrubbed incinerator. The MeSH Vent Header carried waste gas to this incinerator. After the new incinerator was installed, "a dark liquid of unknown composition" accumulated at points in the MeSH Vent Header, which blocked the gas flow. The indictment alleges that "[Insecticide Business Unit] workers periodically opened drain valves on the MeSH Vent Header and let liquid flow out onto the building floor or into a bucket." The indictment alleges that the workers did this without implementing the Line Break Procedure and without any safety review or plan. The indictment alleges that LaPorte employees drained valves without safe work practices set out in a Line Break Procedure for many years. (Docket Entry No. 1 at 10).

On February 9, 2014, an operator sent Sandel an email explaining that workers did not have a "safe and effective way" to drain the MeSH Vent Header on the third floor of the manufacturing building. The email described a method for draining the Vent Header. The following day, DuPont employees directed the operators to follow the method described in the email. The indictment alleges that this method was another instance in a long practice of violating the Line Break Procedure, because the method required the workers to "open a drain valve to the atmosphere on a hazardous system without first clearing the system of chemical hazards." (Docket Entry No. 1-1 at 11). The indictment alleges that Sandel "was responsible for making sure [Insecticide Business Unit] employees took the critical safety steps required by the LaPorte [L]ine [B]reak [P]rocedure and did not release toxic chemicals inappropriately to the environment." The indictment alleges that Sandel knew that the MeSH Vent Header had the potential to contain hazardous gases, knew that operators "routinely" violated the LaPorte Line Break Procedure, and that Sandel routinely failed to implement the Procedure. (Docket Entry No. 1-1 ¶¶ 13–15).

On November 13, 2014, Insecticide Business Unit workers discovered that MeSH could not flow through the MeSH feed line to the MeSH storage tank and to the MeSNa Cooler. This was the first time that the feed line had been plugged in this way. Throughout the day, the workers continued to try to unplug the feed line, without success. On November 14, 2014, Sandel organized a meeting with DuPont engineers to resolve the issue. Sandel and the engineers developed an action plan. The engineers suspected that water from the MeSNa Cooler had leaked backwards into the feed line and that low outdoor temperatures caused the feed line to freeze. Sandel and the engineers decided to inject nitrogen into the MeSH feed line while opening various valves near the MeSNa Cooler. The team planned to pour hot water on the outside of a pump at the storage tank to melt the frozen MeSH in the feed line. The team then decided to pour hot water on the outside of the entire feed line, take photos of the feed line with an infrared camera, and then open the pump for inspection. (Docket Entry No. 1 at 13). One of the engineers wrote the plan on a flip chart in a conference room. The indictment alleges that the plan failed to explain:

> where along the MeSH feed line to place hot water hoses, how long to run the hot water, which specific valves to open at railcar spots 1A4 and 1A2, when to open those valves and the burp valve, how far to open each valve, how long to keep each valve open, whether to inject high-pressure nitrogen into the feed line while the hot water was running, how to prevent MeSH from entering the vent header in liquid form, how to determine when the blockage had cleared, whether to isolate the MeSH in the storage tank from the feed line, what use to make of the pump at the MeSH storage tank or when to attempt to restart flow of MeSH into the MeSNa Cooler.

(Docket Entry No. 1 at 13).

Count One of the indictment alleges that the plan was a purposeful change in the way the manufacturing process normally worked and involved steps that had never been used before, such as warming the entire feed line with hot water and allowing hundreds of pounds of melted MeSH to flow through the feed line. (Docket Entry No. 1 at 14). Count One alleges that DuPont violated

the Line Break Procedure on November 14–15, 2014, by draining the valves on the MeSH Vent Header without implementing safe-work practices when it contained a large volume of deadly MeSH gas.

Count Two alleges that DuPont failed to implement its written procedures to manage changes on November 14 and 15, 2014, before putting the new operation process into action. The indictment alleges that DuPont was required to authorize an Experimental Operating Instruction. An Experimental Operating Instruction must include a step-by-step description of the plan and detailed safety procedures. An Instruction must name the personnel affected by the change, and explain how the new plan would be communicated to them and how they would be trained in the new plan. The indictment alleges that there was no written procedure—no Experimental Operating Instruction—detailing the November 14 drainage plan. (Docket Entry No. 1 at 14).

The indictment alleges that the engineers executed the November 14 plan by filling the feed line with extremely hot water, orally briefed the incoming night shift workers, and then departed for the day. The night operators continued with the plan as described. At 2:47 a.m. on November 15, 2014, the MeSH feed line melted. Thousands of pounds of liquid MeSH began to flow from the storage tank into the feed line and through the open values. A DuPont employee noticed that the MeSH caused high pressure in certain manufacturing vessels and asked a new operator at the Insecticide Business Unit to drain the MeSH Vent Header. The operator did not know that the high pressure was the result of liquid MeSH and, along with her supervisor, opened the drain valves from the Vent Header. Liquid MeSH escaped through the open drain valves and vaporized into the air inside the manufacturing building. The operator radioed for help, but the poison was fast. Both the operator and the supervisor suffocated before help could arrive. Two other operators ran into the building to help. They also died. (Docket Entry No. 1 at 15).

The indictment alleges that approximately 24,000 pounds of MeSH gas escaped into the air through open drain valves on the third floor MeSH Vent Header, injuring more DuPont workers and traveling downwind into the City of Deer Park, Texas, exposing residents to grave health risks. (Docket Entry No. 1 at 16).

Count Three alleges that this negligent release of MeSH flowed into the ambient air and negligently placed others in imminent danger of death and serious bodily injury.

The issues are the timeliness of the motion to reconsider and the sufficiency of the allegations to criminal offenses.

## II.     The Legal Standards

### A.     The Motion for Reconsideration

While the Federal Rules of Criminal Procedure do not provide for a motion for reconsideration, *see United States v. CITGO Petrol. Corp.*, 908 F. Supp. 2d 812, 820 (S.D. Tex. 2012), the Supreme Court has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits." *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) (citing *United States v. Healey*, 376 U.S. 75, 84 (1964)). "Motions to reconsider in criminal cases are judicial creations not derived from any statute or rule." *United States v. Salinas*, 665 F. Supp. 2d 717, 720 (W.D. Tex. 2009) (citing *United States v. Brewar*, 60 F.3d 1142, 1143 (5th Cir. 1995); *Matter of Shivers*, 900 F. Supp. 60, 62–63 (E.D. Tex. 1995)). "The district courts possess continuing jurisdiction over criminal cases and are free to reconsider their own earlier decisions." *Id.* (citing *United States v. Scott*, 524 F.2d 465, 467 (5th Cir. 1975)).

In the civil context, Rule 59(e) governs a motion to alter or amend a final judgment. Rule 54(b), however, governs motions to reconsider orders that do not dispose of every claim or adjudicate the rights of all parties to a case. Fed. R. Civ. P. 54(b); *see Cabral v. Brennan*, 853

8

F.3d 763, 766 n.3 (5th Cir. 2017) (explaining that Rule 59 is a "more exacting" standard). The court considers the Government's motion under Rule 54(b), not Rule 59(e), because the court's order did not dismiss all the charges against DuPont, making it interlocutory in nature. *See* Fed. R. Civ. P. 54(b). Under the Rule 54(b) standard, "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017).

DuPont argues that the government's motion to reconsider should be denied as untimely because it was filed 81 days after the deadline to file the notice of appeal. DuPont argues that even if the motion is considered timely, it should be denied as rehashing the arguments that the court already considered and rejected.

The government filed a timely notice appeal of the court's dismissal of Count One. DuPont filed motions to dismiss Counts Two and Three, and the Fifth Circuit decided to hold the appeal in abeyance pending the resolution of those motions. On March 25, 2022, the Fifth Circuit stayed the appeal on Count One until 60 days after this Court's decision on Counts Two and Three. On May 9, 2022, the government then filed a motion for reconsideration of the dismissal of Count One and responses to the motions to dismiss Counts Two and Three.

"Although there is no statute or rule setting forth the time limits for filing a motion for reconsideration in a criminal case, it is well settled that 'motions for reconsideration are timely if filed within the time prescribed for noticing an appeal under Fed. R. App. P. 4(b).'" *United States v. Collins*, 712 F. App'x 392, 395 (5th Cir. 2017) (quoting *United States v. Brewer,* 60 F.3d 1142, 1143 (5th Cir. 1995)). The government had 30 days to file a Notice of Appeal, and therefore 30 days to move for reconsideration. Fed. R. App. P. 4(b)(1)(B)(i). The government missed that

deadline.  However, *Collins* explained that "the time limit in Rule 4(b) is not jurisdictional." *Collins*, 712 F. App'x at 395.  The court noted that "as set forth previously, the Government's brief expressly stated that this Court could consider this issue, forfeiting any untimeliness argument with respect to the motion to reconsider."  *Collins*, 712 F. App'x at 395.  DuPont argues that *Collins* stands for the rule that "district courts may consider untimely-filed motions to reconsider" only if the opponent fails to object to untimeliness and thus waives Rule 4(b).  Because DuPont objected to the motion to reconsider, (Docket Entry No. 53), DuPont argues that the time limit should be enforced and the court should not consider the motion for reconsideration.

     *Collins* did not say that courts could consider untimely motions for reconsideration only where the timeliness was forfeited.  Those were the facts of *Collins*, but *Collins* explained:

> [W]e are bound by *Martinez*, a published opinion that authoritatively interpreted the Supreme Court's opinion in *Bowles* to hold that the time limit in Rule 4(b) is not jurisdictional.

> Accordingly, although the instant motion to reconsider was untimely filed under Rule 4(b), the district court had jurisdiction to entertain it. **Further, as set forth previously,** the Government's brief expressly stated that this Court could consider this issue, **forfeiting any untimeliness argument with respect to the motion to reconsider**. We therefore turn to the merits of the claim.

*Collins*, 712 F. App'x at 395.  The forfeiture argument was not necessary to the holding in *Collins* that the court may consider an untimely motion for reconsideration.  DuPont's motion to reconsider focuses on the meaning of the word "implement" which is intertwined with the arguments raised in DuPont's motion to dismiss Count Two.  The court exercises its jurisdiction to consider the merits of the motion and correct its own errors.

### B.    The Motions to Dismiss

     Rule 7 of the Federal Rules of Criminal Procedure requires that an indictment be a "plain, concise and definite written statement of the essential facts constituting the offense charged."  "In

reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Moss*, 872 F.3d 304, 308 (5th Cir. 2017) (quoting *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999)). "This court interprets regulations in the same manner as statutes, looking first to the regulation's plain language." *United States v. Fafalios*, 817 F.3d 155, 159 (5th Cir. 2016). "[W]here, as here, a regulatory violation carries criminal penalties, the regulation 'must be strictly construed and cannot be enlarged by analogy or expanded beyond the plain meaning of the words used.'" *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 482 (5th Cir. 2015) (quoting *United States v. Clark*, 412 F.2d 885, 890 (5th Cir. 1969)).

III.    **The Motion for Reconsideration the Dismissal of Count One**

For the first time in the motion for reconsideration, the government provides unpublished Fifth Circuit authority interpreting the word "implement" in civil enforcement actions brought by the Department of Health and Human Services under the Medicare regulations. These cases involve 42 C.F.R. § 483.13(c), which requires care facilities to "develop and implement" policies to prevent "mistreatment, neglect, and abuse of residents."

*Brenham Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 637 F. App'x 820 (5th Cir. 2016), was an appeal of a civil monetary penalty against a nursing home. Two nurse assistants discovered that one of the nursing home residents had extensive bruising and swelling on her body. *Id.* at 822. They reported the injuries to a charge nurse, who reported it to the Director of Nursing and completed an incident report. *Id.* The Director of Nursing concluded that the bruising was caused by a device used to transfer debilitated patients and did not report the bruising to state officials. *Id.* at 822–23. State surveyors discovered the bruising during an inspection and

11

reported that Brenham had violated 42 C.F.R. § 483.13(c). The Administrative Law Judge and the Appeals Board upheld the enforcement actions.

Although the "heart of" the case involved whether the nursing home's abuse prevention policies required it to report injuries of unknown origins to state authorities, the Fifth Circuit also rejected the argument that having policies in place was enough to comply with § 483.13(c). *Id.* at 824. The Fifth Circuit explained that "'implement' is not limited to training and indeed . . . the cited deficiency was largely grounded in Brenham's failure to effectuate its policies." *Id.* at 825. The court concluded that the failure to report the suspected abuse—the failure to carry out the policies that were in place and that the staff was trained in—violated the requirement that the nursing home not only develop and train staff in abuse prevention policies, but also to implement the policies by effectively carrying them out in practice. *Id.*

In *Brenham Nursing*, the court cited to *Honey Grove Nursing Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 606 F. App'x 164 (5th Cir. 2015), another civil enforcement action under § 483.13(c). In *Honey Grove*, a nursing home resident refused care from a staff member, and the staff member's handling of the patient caused bruising and skin tears. *Id.* at 166. The nursing home reported the incident to the responsible state agency. The agency's investigation concluded that the facility had failed to develop and implement abuse prevention policies. *Id.* The Centers for Medicare and Medicaid Services agreed and imposed a civil monetary penalty. *Id.* at 167. The ALJ and Appeals Board affirmed. *Id.* Applying the substantial evidence standard, the Fifth Circuit pointed to evidence that other staff members had disclosed during the investigation a history of issues between the staff member involved and the injured resident. *Id.* at 168. "The fact that multiple employees failed to report the certified nurse assistant's comments about his abusive treatment of Resident 1 shows that although Honey Grove may have had policies in place, they

12

were ineffective." *Id.* The court concluded that ample evidence showed that Honey Grove had failed to implement the anti-abuse policies and procedures by failing to effectuate them in practice.

In *Mississippi Care Ctr. of Greenville v. U.S. Dep't of Health & Hum. Servs.*, 517 F. App'x 209 (5th Cir. 2013), a nursing home resident escaped the facility, which reported the incident to the state authorities. The facility had two elopement prevention systems in place in practice— door lock keypad codes and security cameras—but these systems were not addressed in the written policies and procedures. *Id.* at 213. The court explained, "the regulation requires that [nursing homes] both *develop* policies and procedures to prevent neglect and *implement* those procedures." *Id.* The court concluded that the Appeals Board and ALJ's conclusions that the nursing home violated § 483.13(c) was supported by substantial evidence based on the following evidence:

> The testimony of MCC staff, however, indicates that there was at least some confusion as to the standard course of procedure for addressing elopement. Moreover, this argument does not refute the ALJ's and DAB's conclusion that, if MCC chose to rely on the keypad door locks and security cameras to protect its residents from elopement, it should have provided corresponding written policies to instruct its staff on how to use them properly. The fact that MCC had the ability to use its keypad door locks and security cameras to further prevent the elopement of its residents, in combination with the fact that its other policies were clearly inadequate to prevent elopement (as evidenced by the actions of the Resident), suffice to show that the ALJ's and DAB's holdings were supported by substantial evidence.

*Id.*

In both *Mississippi Care* and *Brenham Nursing*, the Fifth Circuit cited to *Life Care Ctr. of Gwinnett,* DAB 2240, 2009 WL 1176324, at *4 (DHHS 2009), in which the Department of Health and Human Services explained that:

> A written policy must adequately address the risks of neglect. [A] policy that exists only on paper provides no benefit to the residents . . . . Procedures which are not carried out in practice are worthless. Training or other measures to implement a policy can only be understood as sufficient if those measures are calculated to ensure neglect is prevented.

DuPont points to *Heron Pointe Health & Rehab.*, No. CR1401, 2006 WL 321181, at *8–9 (2006), in which the Department of Health and Human Services Appeals Board concluded that § 483.13(c) was not violated based on evidence of single incident of neglect.  The Board explained: "I will not infer from the one alleged incident of neglect in this case that there was a general failure to implement the required policies.  In fact, the weight of the evidence is that such policies were implemented at Petitioner's facility."  *Id.*

*Brenham Care*, *Honey Grove*, and *Mississippi Care* involved civil enforcement actions under the Medicare regulations and review under the substantial evidence standard.  The *Heron Pointe Health* court's discussion of interpretation of the word "implement" was limited.  The question is how this precedent applies in this criminal case under the Clean Air Act.  *United States v. Moss*, 872 F.3d 304 (5th Cir. 2017), is helpful to answering this question.

In *Moss*, Fifth Circuit affirmed the dismissal of an indictment charging contract workers on an offshore oil platform with violations of the Outer Continental Shelf Lands Act.  *Id.* at 305.  The question before the Fifth Circuit was whether the regulations applied to contractors, or only to those parties listed in the regulations: lessees, permittees, and well operators.  The Fifth Circuit pointed to the "virtually non-existent past enforcement" against contractors.  *Id.* at 312.  The government pointed to a single guilty plea and a dated internal Department of Interior memorandum, both involving contractor liability.  *Id.*  The Department of Interior had announced in an internal policy memorandum that contractors could be liable for civil penalties only months before the incident at issue.  *Id.* at 306.  Only a year before the accident at issue, the agency started enforcing the regulations against contractors.  *Id.*  The court explained that this "about-face 'flatly contradicts' the agency's earlier, contemporaneous interpretation of the regulations," so the agency interpretation would "hardly" be entitled to deference in the civil context.  *Id.* at 315.  Due process

barred the government from pursuing criminal charges based on this "novel" interpretation, which was at odds with 50 years of agency policy.  *Id.*

This court explained in the opinion granting the motion to dismiss Count One that *Moss* makes clear that "rule of lenity and prior notice to the defendant override agency deference in a criminal prosecution."  (Docket Entry No. 44 at 15).  The court explained that the consent agreements—which the government relied on to argue that courts had consistently interpreted "implement" to mean "follow" under the Clean Air Act—were insufficient to establish an agency's authoritative position.

There is scant precedent interpreting the word "implement" in criminal enforcement proceedings under the Clean Air Act.  That perhaps reflects how unusual it is for the government to bring criminal proceedings under the Act.  This court previously concluded that "implement" means something different than "create" or "develop" a safe practices procedure, which the government does not appear to challenge.  The government does challenge the court's prior conclusion that, in the criminal context, to "implement" a safe practices procedure means something different than to "follow" those practices.  The court decided, with little guidance, that § 68.69(d) requires owners and operators to develop the procedures for safe practices, and to have a plan to put those procedures into practice or effect, but did not require DuPont to actually carry out the procedures.  The decision did not foreclose interpreting other sections of the Clean Air Act or other applicable regulations as requiring not only developing and having a policy, but also making it effective by following it in carrying out the actual work.  The government asks the court to reconsider this decision, arguing that "implementing" a safety plan under § 68.69(d) means not only developing the safety plan procedures, writing them down, and teaching them in the workplace, but also consistently and actually following the plan.

In the motion for reconsideration, the government provided authority showing that the Fifth Circuit has consistently interpreted the same or similar language in the civil context to mean that an incident in which the defendant failed to follow a safety plan or policy is a "failure to implement" violation, when the incident shows that the policy was consistently disregarded and not put into practice. This analysis is instructive. These cases support the government's argument that the definition the government asks the court to give "implement" in this context is not novel and therefore does not raise the due process concerns that were present in *Moss*.

In *Delek Ref., Ltd. v. Occupational Safety & Health Rev. Comm'n*, 845 F.3d 170 (5th Cir. 2016), the Fifth Circuit distinguished between regulations requiring employers to actually remedy safety hazards, and those that require only that certain processes be followed. The regulations at issue in *Delek* required employers to "establish a system to promptly address the [process hazard analysis] team's findings and recommendations," "assure that [process hazard analysis] recommendations are resolved in a timely manner," and "promptly determine and document an appropriate response to each of the findings of [a] compliance audit, and document that deficiencies have been corrected." 845 F.3d 170, 175 (5th Cir. 2016); 29 C.F.R. § 1910.119(e)(5); 29 C.F.R. § 1910.119(o)(4). The government argued that the continuing violations theory applied to toll the statute of limitations of these regulations because there were continuing, unlawful risks to employee health and safety. *Id.* at 178. The court concluded that the regulations did not require the employer to "*actually remedy* the issues addressed in a PHA or audit recommendation." *Id.* The employers had the discretion to reject the findings and recommendations from the audit and could conclude that no resolution to an identified safety hazard is necessary. *Id.* The court explained:

> In other words, while a PHA or audit might result in a recommendation—even a safety-related recommendation—an employer is under no obligation to actually

> implement that recommendation.  This structure is quite unlike a safety regulation
> which commands the employer to actually remedy a safety hazard and maintain a
> workplace free of such hazards, and it distinguishes subsections (e)(5) and (o)(4)
> from the type of safety-related regulation for which a continuing violations theory
> might be appropriate.  Accordingly, we cannot agree with the Secretary that the
> continuing violations theory applies here.

*Id.* at 178–79.  The government argues that this language shows the Fifth Circuit tied "implement"

to meaning "actually remedy a safety hazard and maintain a workplace free of such hazards."  The

government argues that this shows that "implement" means execute or carry out.  The regulations

in *Delek* did not require a safety recommendation to be followed.  The government has now

provided authority supporting its argument that § 68.69(d) is violated if a required safety procedure

has not been followed in practice.  This authority supports the argument that the Fifth Circuit

would not interpret § 68.69(d) in the same way it interpreted the type of regulation at issue in

*Delek*.  In dismissing Count One, the court concluded that "[a]s with the regulation at issue in

*Delek*, § 68.69(d) does not require an owner or operator to 'remedy a safety hazard and maintain

a workplace free of such hazards.'"  The government's additional authority supports a different

interpretation of § 68.69(d).  The authority supports the argument that unlike the regulations at

issue in *Delek*, § 68.69(d) can be violated by a failure to follow a safety practice.  Section 68.69

is, under this approach, a safety regulation that requires an owner or operator to "actually remedy

a safety hazard and maintain a workplace free of such hazards."  *See Delek*, 845 F.3d at 178–79.

Importantly, this case is at the motion to dismiss stage.  The test for the validity of an

indictment is "not whether the indictment could have been framed in a more satisfactory manner,

but whether it conforms to minimal constitutional standards."  *Crow*, 164 F.3d at 234.  This

requires the indictment to "inform a defendant of the charges against him and set a predicate for a

subsequent invocation of the double jeopardy clause."  *United States v. Devoll,* 39 F.3d 575, 578

(5th Cir. 1994). "The validity of an indictment is governed by practical, not technical considerations." *Crow*, 164 F.3d at 234.

The indictment alleged that there was a practice of draining the MeSH Vent Header inconsistent with the Line Break Procedure, this practice caused MeSH to escape on November 15, 2014, and that DuPont had consistently failed to implement or follow or put into practice the Procedure. The indictment alleged that before opening any hazard system, certain protocols had to be followed to assess and eliminate the risks from the hazard system. (Docket Entry No. 1 at 5). The LaPorte Line Break Procedure required workers to "'properly isolate' the section of the equipment or line to be opened," and provided that "a line was 'cleared' only when toxicity, corrosiveness and flammability hazards were 'reduced to acceptable levels and verified with acceptable test methods.'" (Docket Entry No. 1 at 5). The indictment alleged that starting in 2011, an unknown liquid periodically accumulated in the MeSH Vent Header and workers would open the drain valves on the MeSH Header to allow the excess liquid to flow onto the floor or into a bucket. (Docket Entry No. 1 at 10). The workers did this for years, without following the LaPorte Line Break Procedure. (Docket Entry No. 1 at 10). In February 2014, an operator suggested a different method for draining the vent header in an email received by Sandel. DuPont engineers instructed operators to follow that method, even though the method violated the Line Break Procedure by not requiring workers to clear the system of hazards before opening a drain valve to the system. Operators continued to use this approach, disregarding the Line Break Procedure, throughout 2014. The indictment alleged that Sandel knew that "operators routinely opened the MeSH Vent Header on the third floor of his unit in a manner that violated the LaPorte line break procedure, and that fumes escaped from the vent header into the building, yet [he] allowed the practice to continue and did not implement the line break procedure." (Docket Entry No. 1 at 11).

The indictment alleged that this failure contributed to the gas escape on November 15, 2014. (Docket Entry No. 1 at 11).

Fifth Circuit authority supports the argument that the allegations of the failures to follow the Line Break Procedures on November 14 and 15, 2014, are allegations that the Line Break Procedures were not implemented—they were written down and put into place, but they were consistently disregarded. They were not followed in practice. The cases the government cites concluded that the nursing home facilities had failed to implement anti-abuse policies because the residents were injured by staff failures to implement those policies by putting them into practice. In *Honey Grove* and *Mississippi Care*, the Fifth Circuit pointed to evidence in the record beyond the injury-causing incident, showing that the policies were consistently not followed. Under these cases, the employees' alleged failures to perform the safety policies may show that the policies were not implemented, depending on the history of following the policies, the causal relationship between the policies and the injury, and the nature of the injury.

This court's earlier interpretation of the meaning of "implement" was too narrow. The allegations that the defendants consistently failed to perform the required written safety Line Break Procedure are sufficient to allege a failure to implement the Procedure. DuPont may be correct that this case involves only a single failure to follow policies that had been implemented, in the sense of being developed into specific written plans for employees to use. In *Heron Pointe*, the Appeals Board pointed to the "weight of the evidence" showing that the policies were actually implemented, despite a single failure to follow them that caused the injury at issue. Here, the government will have the burden of proving that this fatal incident was not an isolated deviation from the Line Break Procedure, but the result of a consistent failure to follow it. The question of whether the failure to follow the safety practices on November 14 and 15, 2014, was the result of

DuPont's consistent failure to implement the Line Break Procedure or an isolated incident or one unrelated to the Procedure will be subjects at the trial, but the present issue is whether the indictment alleges a triable offense.  It does.  The indictment includes allegations that the failure to follow the policies was a general practice at the LaPorte facility.  The indictment is detailed and the allegations are clear.  DuPont cannot claim "to be unaware of the government's theory of the case, the nature of the charges against it or that the indictment in some way fail[s] to protect it from future prosecution."  *Crow*, 164 F.3d at 235.  The meaning of "implement" will be addressed by jury instructions.

The government has not asked the court to revisit its conclusion that § 68.69(d) is not a continuing offense, but that conclusion does not change the outcome here.  The indictment alleges that § 68.69(d) was violated by the failure to implement safe work practices within the statute of limitations.  Evidence that there was an ongoing practice of not following the Line Break Procedures before November 7, 2014, is relevant to showing that the incident on November 14 and 15, 2014, was the result of a general failure to implement the safety practices.

The indictment alleges an offense, and DuPont's arguments will be fully considered on the basis of the evidence presented at trial.  The court grants the motion for reconsideration as to Count One.  The motion to dismiss Count One at the pleading stage is denied.

IV.     **The Motions to Dismiss Counts Two and Three**

A.     **The Motion to Dismiss Count Two**

1.     **The Meaning of "Implement" in § 68.75(a)**

Count Two charges a knowing violation of § 68.75(a) which, as relevant here, provides as follows:

Management of change.

(a) The owner or operator shall establish and **implement written procedures to manage changes** (except for "replacements in kind") to process chemicals, technology, equipment, and procedures; and, changes to stationary sources that affect a covered process.

b) The procedures shall assure that the following considerations are addressed prior to any change:

     1. The technical basis for the proposed change;
     2. Impact of change on safety and health;
     3. Modifications to operating procedures;
     4. Necessary time period for the change; and,
     5. Authorization requirements for the proposed change.

DuPont argues that the indictment fails to state an offense because it did put into place the required written procedures for management of change, and the allegations are only that it failed to follow those procedures or put them into practice. The government argues that there is a difference between the §68.75(a) requirement to "establish" written procedures and the §68.75(a) requirement to "implement" those procedures. The government additionally argues that the allegations raise a triable issue as to whether DuPont's own management-of-change policies applied to the conduct that led to the four deaths—that is, whether the conduct amounted to a "change."

The indictment alleged that on November 14, 2014, Sandel and the DuPont engineers drafted a new plan for addressing the frozen MeSH line on a flip chart in a conference room, and that this new plan was a change to the manufacturing process that required DuPont to follow its own written management-of-change procedures. (Docket Entry No. 1 at 14). The indictment alleged that this was a change to the manufacturing process because it was the first time that the entire MeSH feed line was warmed with hot water and hundreds of pounds of melted MeSH would flow from the MeSH feed line into the MeSH Vent Header. (Docket Entry No. 1 at 14). The indictment alleged that DuPont's management-of-change procedures required Sandel to authorize

an Experimental Operating Instruction, which had to include a step-by-step description of the new plan and an explanation of how the plan addressed safety and environmental concerns.  (Docket Entry No. 1 at 14).  The indictment alleged details of the new plan, the management-of-change procedures that applied to this change, and how the plan was lacking under those requirements.

The government cites to a history of consent agreements showing that it has brought enforcement actions under § 68.75(a) when a company failed to follow its own management-of-change procedures.  The government also cites several internal DuPont documents that use the word "implement" to mean "perform," "follow," or "carry out."  (Docket Entry 52 at 19).  For example, in DuPont's internal report about the November 15, 2014, gas release, DuPont explained that "[o]perations personnel met with process engineers and developed an action plan on the morning of November 14 to clear the MeSH feed line. Operations personnel **began to implement** the action plan during the day shift on November 14."

The same reasoning about the meaning of "implement" in § 68.69(d) applies here.  Under the Fifth Circuit's interpretation of "implement" in other regulatory provisions, an incident or injury resulting from the failure to follow a required procedure on one occasion can show a systemic or consistent failure to implement or follow the procedure.  *See, e.g.*, *Mississippi Care Ctr. of Greenville*, 517 F. App'x at 213 ("A written policy must adequately address the risks of neglect . . .  Procedures which are not carried out in practice are worthless.") (quoting *Life Care Ctr. of Gwinnett,* DAB 2240, at *4 (2009) (H.H.S.)); *Honey Grove Nursing Ctr.*, 606 F. App'x at 168 (a policy was not implemented because "multiple employees failed to report the . . . abusive treatment of Resident 1 [which] shows that although Honey Grove may have had policies in place, they were ineffective").

The indictment alleged that on November 14 and 15, 2014, DuPont made changes to the procedures used to drain the MeSH vent line.  The indictment alleges that those changes violated the Company's own management-of-change procedures, procedures that were required by § 68.75(a).  Whether those procedures applied to the actions taken on November 14 and 15 because those actions were a change to the usual draining steps, as opposed to an effort to restore the standard steps, and whether this was an isolated failure to implement or carry out the management-of-change procedures or an ongoing failure to implement or carry them out, are issues that the government will have the burden of proving at trial.  The indictment alleges an offense, and DuPont's arguments will be fully considered on the basis of the evidence presented at trial.  The motion to dismiss Count Two at the pleading stage is denied.

### 2.        The Mens Rea Allegations

DuPont argues that section 7413(c)(1) of the Clean Air Act criminalizes only knowing violations of regulations, and that the government needed to allege that the defendants knew that they were failing to implement DuPont's change procedures when they attempted to unfreeze the pipe.

Count Two alleges that the defendants "did knowingly violate a requirement of a regulation promulgated under the Clean Air Act Title 42, United States Code, Section 7412(r)(7), to prevent accidental releases of regulated substances, specifically, Title 40, Code of Federal Regulations, Section 68.75, by failing to implement written procedures to manage changes."  This tracks the language of § 7413(c)(1) and sufficiently alleges the required mens rea.  The government's citations to DuPont's use of "implement" in its internal reports may provide further evidence of DuPont's mens rea at trial.  And, of course, the court will fully hear the parties' arguments on whether the evidence at trial is sufficient to show the requisite mens rea and what instructions the

jury should receive on mens rea.  *United States v. Cabello*, 33 F.4th 281, 288 (5th Cir. 2022).  The indictment is sufficient to withstand the motion to dismiss.

### B.      The Motion to Dismiss Count Three

Count Three alleged that DuPont negligently released and caused the release into the ambient air of an extremely hazardous substance, methyl mercaptan, and at the time negligently placed another person in imminent danger of death and serious bodily injury, in violation of § 7413(c)(4).  That section provides:

> Any person who negligently releases into ambient air any . . . extremely hazardous substance listed pursuant to section 11002(a)(2) of this title and who at the time negligently places another person in imminent danger of death or serious bodily injury shall, upon conviction, be punished by a fine under title 18 or imprisonment for not more than 1 year, or both.

This is one of the "endangerment provisions" of the Clean Air Act that provide criminal penalties for the release of hazardous substances in the "ambient air."  The indictment alleged that, as a result of the release of Liquid MeSH, "approximately 24,000 pounds of MeSH gas escaped into the air through open drain valves on the third floor MeSH Vent Header, injuring more DuPont workers inside and outside the IBU manufacturing building and traveling downwind into the city of Deer Park, Texas, and beyond."  (Docket Entry No. 1 at 16).

DuPont argues that because the four deceased employees were inside the manufacturing building when they were killed from the hazardous fumes, the release was not in the "ambient air," as a matter of law.  DuPont argues that "ambient air" means the portion of the atmosphere, external to buildings, to which the general public has access.  (Docket Entry 50 at 12).  DuPont argues "there is no legitimate factual dispute on this key issue: the 'imminent danger of death and serious bodily injury' in Count Three occurred inside a building within the fence line of DuPont's plant, and only there."  (Docket Entry No. 50 at 6, n.3).

24

DuPont concedes that Congress did not provide a specific definition for "ambient air" in the Clean Air Act. DuPont argues that the EPA has construed "ambient air" to mean "outside the fence line." Memorandum from Andrew Wheeler, EPA Administrator, to Regional Administrators, Revised Policy on Exclusions from "Ambient Air" at 1 (Dec. 2, 2019). DuPont argues that the Environmental Protect Agency's longstanding definition of "ambient air" is "that portion of the atmosphere, external to buildings, to which the general public has access." 40 CFR §50.1(e).

DuPont relies on the definition of "ambient air" that the Environmental Protect Agency uses in the National Primary and Secondary Ambient Air Quality Standards, which regulate air pollution. The government responds that the goals of the National Primary and Secondary Ambient Air Quality Standards and the Clean Air Act are different. The government argues that the Clean Air Act endangerment provisions are about deterring "catastrophic one-time releases," rather than monitoring ongoing pollution. The government points to *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007), in which the Supreme Court interpreted the word "modification" differently in different parts of the Clean Air Act, to argue that there is good reason to interpret "ambient air" differently in the endangerment one-time release provisions than in the ongoing monitoring provisions.

DuPont also relies on *United States v. Ho*, in which the court excluded expert testimony at trial about the air inside a hospital in a case involving a knowing endangerment charge, concluding that testimony about the air inside the hospital was not relevant because it did not address "any imminent danger of death nor serious bodily injury as a result of the defendant's release of asbestos into the ambient air." *United States v. Ho*, 4:00-cr-00183 (S.D. Tex. Dec. 1, 2000), Docket Entry No. 94 at 8. In this case, the government has alleged that the highly concentrated toxic gas was

released both inside and outside the plant building, almost immediately killing those near the site of the release.  The issue in *Ho* was not the sufficiency of the allegations, but the relevance of expert testimony about the air inside a building. The allegations here are of a release both inside and outside the plant building, allegations that appear to be different from the subject of the trial in *Ho*, which was about asbestos released inside the hospital building only.

The government cites *United States v. O'Connell*, No. 17-CR-50, 2017 WL 4675775, at *3 (E.D. Wis. Oct. 17, 2017), and argues that it is the only other court to have considered the meaning of "ambient air" at the motion to dismiss stage.  In *O'Connell*, the court concluded that the meaning of "ambient air," as used in 42 U.S.C. § 7413(c)(4), may include air that is released inside a building.  That court explained:

> The word "ambient" does not mean "outdoors"; it means "existing or present on all sides; encompassing."  MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 36 (10th ed. 1999).  Construing the term "ambient air" to include air inside the building does not make the word "ambient" superfluous.  It means that it is not enough for the asbestos simply to be present in an isolated portion of the air; it must be diffused into the surrounding air, whether that air is inside or outside of the building.

*United States v. O'Connell*, No. 17-CR-50, 2017 WL 4675775, at *3.  In *O'Connell*, the court acknowledged that "the indictment in fact does allege that asbestos was released to the outside." *Id.*  The court explained that "[t]he statute simply requires that the defendants negligently released a hazardous air pollutant into the ambient air and at the time negligently placed another person in imminent danger of death or serious bodily injury," and so, "regardless of how 'ambient air' is defined, the defendants' motion should be denied." *Id.*

The indictment alleged that DuPont's MeSH gas release on November 15, 2014, traveled beyond the fence line of the LaPorte facility and into the city of Deer Park.  The government provided exhibits showing that the toxic gas traveled to parking lots that were accessible to the

public. (Docket Entry Nos. 52-1; 52-3). The government previewed that "a [case] agent will testify that although both parking lots are fenced and have gates, they are accessible to the public and the east lot serves as a visitor parking lot." (Docket Entry No. 52 at 28). The indictment alleged that the same gas that killed workers inside the building also injured multiple workers outside the building and traveled beyond the fence line. DuPont is raising a factual dispute as to where the gas went and whether those locations constitute "ambient air." Even if "ambient air" is limited to air "beyond the fence line" of DuPont's facility, the indictment sufficiently alleged that DuPont released the MeSH outside the facility and that it traveled beyond the fence line. The motion to dismiss Count Three is denied.

## V.     Conclusion

The court grants the motion for reconsideration of the dismissal of Count One, and denies the motions to dismiss Counts Two and Three. The final pretrial conference set for October 4, 2022 remains scheduled.[1]

SIGNED on August 18, 2022, at Houston, Texas.

_Lee H. Rosenthal_
Lee H. Rosenthal
Chief United States District Judge

---

[1] One last point. The events at issue took place in 2014. The government has appealed the earlier dismissal of Count One, and the appellate court has stayed the appeal pending this court's ruling on the motion for reconsideration. It makes sense to try the case without the further erosion of evidence and memories that additional delay for pretrial appellate consideration will bring. It also makes sense to consider the issues on the fuller record that a trial will provide. Finally, it makes sense to have the trial. If the appeals court then rules that the counts should be dismissed, they will be. If the appeals court rules that the counts state viable offenses, there will be no need for an even longer and delayed trial.